UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
BRUCE BEHRENS, KATHLEEN BEHRENS,
SHERRI SHEFFERT AND DAVID SHEFFERT,


**AMENDED   COMPLAINT**

Plaintiffs,,
Civil Action No.
6:24-CV-02047  MAR

-against-
JURY TRIAL
DEMANDED


JPMORGAN CHASE BANK, N.A., U.S.BANK,
N.A., CHICAGO MERCANTILE EXCHANGE,
INC.,THE CME GROUP, INC.,  John Does # 1-40,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

Dated: February 14, 2025

Susan J. Levy, Esq.
By: /s/ Susan J.. Levy
Attorney for Plaintiffs
40  East 10ᵗʰ Street
Suite 2k
New York, New York 10003
Tel: (212) 962-1965
Fax: (212)962-3711
Email: sjl19265@gmail.com

Day Reitig Martin, P.C.
Joseph Day, Esq. AT0001902
150 First Avenue,  N.E. Suite 41
P.O.Box 2877
Cedar Rapids, IA 52406-2877
Phone: (319) 365-0437
Fax:    (319) 365-5688
Emails: jday@drpjlaw.com

## TABLE OF CONTENTS

pages

Summary of State Law Violations..........................................................................................2

Unnamed Co-Conspirators........................................................................................6

How Commodities Futures and Options are Traded over Exchanges....................................10

Customer Segregated Accounts are Fundamental to Futures and Options Trading................19

The Handling of Customer Segregated Accounts By the Commodities Futures
Professionals.....................................................................................................20

Jurisdiction and Venue...........................................................................................23

The Parties and Relevant Non-Parties......................................................................23

Non-Party Co-Conspirators....................................................................................28

Futures and Options over the CME Exchange engaged in by PFG on behalf of PFG
and its customers................................................................................................31

U.S. Bank, N.A....................................................................................................32

Procedural History...............................................................................................41

Recent Procedural History..  ................................................................................41

Prior Procedural History.........................................................................................42

Substantive Allegations.........................................................................................43

2005 Opening of the Plaintiffs' Customer Accounts-Based
on Fraudulent Inducement and Minimization or
Risks...............................................................................................................45

Crossland and Millenium Trust Company-March, 2007 to August,
2008.................................................................................................................49

Other instances of Fraudulent Inducement Based on Naked Puts and Calls.
bound to lose 95% of the
Time.................................................................................................

## TABLE OF CONTENTS

pages

Role of Wasendorf, Sn. and PFG in the Theft of $215 Million Dollars During the Relevant Time Frame.................................................................................................................67

PFG'S Misuse of Customer Funds from 1992 to 2012 and Concealment of The Fraud....................................................................................................................................68

Additional Facts Pied with Particularity Regarding U.S. Bank Leading to the Loss of Customer Funds ................................................................................................................ ....71

Particular Facts of U.S. Bank's Relationship with Wasendorf and his Affiliates................. .....73

U.S. Bank Jeopardizing the safety of customer funds............................................................ ...77
U.S. Bank had knowledge that PFG was Not Earning Revenue from the #1845 Account and Was Not Profitable.................................................... ...81

PFG's Record of Regulatory Violations..................................................................................81

Intentional Conduct of JPMorgan Chase, NA (JPMC) Leading to The Loss of Customer Funds....................................................................................83

Role of the CME and CME Group............................................................................................86

Undersegregation of PFG During the Relevant Time Period....................................................93

Defendants Improper Use of IRA Accounts.............................................................................99

Federally Created Minimum Fiduciary Standards of Conduct for The IRAs...........................100

Reds That Were Ignored By CME..........................................................................................102

Foreseeability ........................................................................................................................103

Continuation of Ponzi Scheme...............................................................................................103

Causation and Damages: Plaintffs Were Unable to Recover in their NFA Arbitrations from 2009 to 2011 and NFA was the DSRO for PFG.................................104

Equitable Tolling of the Statute of Limitations.......................................................................111

STATE LAW CLAIMS FOR RELIEF....................................................................................116

# TABLE OF CONTENTS

pages

CLAIM I-Principal Agent Liability.............................................................116

CLAIM II-Fraud by Omission Against the Bank Defendants and CME Group........................117

CLAIM III-Violations of Illinois Fiduciary Obligations Act,
      760 Ill. Comp. Stat. §65.1, et seq., or, alternatively, of
      various states' enactments of the Uniform
      Fiduciaries Act. (Against The Bank Defendants).................................119

CLAIM IV-Breach of Fiduciary Duty (Against Defendants)......................................120

CLAIM V-Breach of Contract including the Obligation of good Faith
      and Fair dealing against all defendants........................................122

CLAIM VI-Against CME Group for negligence and gross negligence..............................125

CLAIM VII-Breacho fiduciary duty and breach of
      unwritten contract against CME Group...........................................125

CLAIM VIII- Aiding and Abetting Against All Defendants......................................127

CLAIM IX- Violation of Iowa Code §706. A2, Et. Esq..........................................127

CLAIM X- Negligent and Intentional Infliction of Emotional Distress
      Against All Defendants.........................................................127

CLAIM XI- Punitive Damages Against All Defendants...........................................127

CLAIM XII- Unjust Enrichment and Restitution under State Law
      Against All Defendants.........................................................128

CLAIM XIII- Intentional Interference with Contract and Prospective
      Business Advantage Against All Defendants......................................128

Demand for a jury Trial.....................................................................129

Prayer for Relief...........................................................................129

-iii-

Plaintiffs' by their attorneys submit this Amended Complaint and allege to be true all matters set forth herein upon personal knowledge and to those facts not within their personal knowledge they plead based upon information and belief as to all other matter.

1. Plaintiffs are Bruce Behrens, Kathleen Behrens, Sherri Sheffert, and David Sheffert (collectively "Plaintiffs"), by and through their attorney Susan J. Levy, Esq., for their Amended Complaint against Defendants, JP Morgan Chase Bank, N.A., U.S. Bank, N.A. The Chicago Mercantile Exchange, (The "CME"), The CME Group, Inc. ("CME Group")(Collective "CME"), and John Does #1-40 (collectively, as "defendants") on behalf of themselves who held accounts at Peregrine Financial prior to July, 2012 and who found their accounts worthless.

2. On or about September 24, 2007, and during the relevant time period (through October, 2008), Plaintiffs, from Oelwein Iowa were directed by PFG to send their investments funds to JP Morgan's Segregated Customer Account ending in #5265.

3. Included in these funds at JPMorgan were IRA monies that eventually were transferred into the U.S. Bank's # 1845 account and then converted by Wasendorf with the assistance of co-defendants.

4. Plaintiffs the Shefferts caused to be transferred approximately $228,000.00 from their custodial account to JP Morgan Chase to account number ending in #5265 for further credit to PFG, Inc. Customer Segregated Funds.

5. Plaintiffs invested with Peregrine Financial Group through Introducing Brokers located in Iowa such as Perry Comeau located in Iowa, or directly through Peregrine Financial Group, Inc. ("PFG') from 2007 to 2008, the relevant time period.

6. PFG also conducted business in Iowa and maintained an office in Iowa during the relevant time period

7. Plaintiffs also filed proofs of claim in the related Class Action entitled In Re

Peregrine.Financial Group Litigation, 12-cv-5546 (N.D.Ill. 2012.).    However, these Plaintiffs became decertified in the Class Action, and were not entitled to recover in that forum.

8.      The trading of Plaintiffs' futures at issue occurred over the Chicago Mercantile Exchange ("CME" hereinafter) which is a designated Board of Trade pursuant to the Commodities Exchange Act 7 U.S.C. § 7. Et. Seq.

9.      The CME Group, Inc., ("CMEG' hereinafter), wholly owns and operates the CME.  CMEG is not merely a holding company.

## SUMMARY OF STATE LAW  VIOLATIONS

10.      These claims are brought inter  alia sounding in breach of fiduciary duty breach of contract and Fraud by Omission against JP Morgan Chase, NA and US Bank, N.A. and against for Breach of Contract and Breach of Fiduciary duty against CME and CME Group both as a principal and agent of the Chicago Mercantile Exchange.

11.      CME wears two hats.  It is a registered board of trade pursuant to and as defined by the Commodities Exchange Act 7 U.S.C. §7, Et. Seq.   As a registered board of trade, CME enjoys some immunity from suit because it is charged with the duty of regulating the commodities markets, therefore serving as a Regulator.

12.      However, besides being a registered board of trade, CME also is a wholly owned subsidiary of  private  C Corporation, the CME Group, Inc. Co-Defendant herein.  The CME Group, Inc. appears to be in business soley for private purposes to maximize shareholder value.

13.      CME Group, Inc. is unregistered and is not a board of trade as defined by the Commodities Exchange Act, 7 U.S.C. §7, Et. Seq.

14.      The CME Group, has never bothered to register or apply to become registered  as a board of trade, although it is admittedly running these exchanges through it proxies including the Chicago Mercantile Exchange, the New York Mercantile Exchange and the Chicago Board of

Trade.

15.     The CFTC requires that all Boards of Trade that run futures and options trading be registered and approved by the CFTC.

16.     Absent such registration, there is no immunity from suit that the registered agents do enjoy to some degree.  Therefore CMEG is not immune from suit under 7 USC §7 et seq. based on its unregistered status.

17.     The CME Group, Inc. is not merely a holding company rather it actively manages and runs these exchanges, and it has ultimate authority and control over its subsidiarties and controls their actions including defendant CME.

18.     For example, CME Group, Inc. has published a rule book that each of its member boards of trade must abide by.

19.     CME as the registered board of trade does not create the rules of the Exchange, rather it is the parent, CME Group upon information and belief makes the rules that govern the CME's conduct and their members.

20.     As such, the CME wears two hats; it is a registered board of trade, but it is also an agent implementing the rules and regulations promulgated by its parent the CME Group; and as such in its agency role with respect to its parent a non-registered C Corporation, CME is a proper defendant based on agency.

21.     CMEG also maintains a website entitled www.cmegroup.com in which it provides members of the public with rules and regulations and other information regarding its subsidiary CME.

22.     CME does not maintain its own website and all inquiries, rules, regulations and other information pertaining to CME is provided for by its Parent, CME Group, Inc.

23.     CME Group, Inc. not CME, entered into the Co-Location Agreement with

Russel Wasendorf on behalf of PFG.  Annexed hereto as Exhibit       is the Co-Location

Agreement.

24.  PFG paid CME Group, Inc. substantial consideration for the privilege of using the

Globlex, an electronic trading platform, whereby Plaintiff through their brokers and agents

located in Iowa, could directly ascertain prices of futures and options contracts traded over the

CME exchange in real time.  The use of the Globex also allowed Plaintiffs in Iowa through their

agents and brokers and investment advisors in Iowa  to place trades over the Chicago Mercantile

Exchange in Iowa generating fees and profits for CME and its private C Corporation Parent,

CME Group Inc.

25.  CME and CME Group, Inc. also gained substantial profits from availing themselves

to the State of Iowa and gaining  monthly fees from its Globex contract allowing PFG in Iowa to

trade directly over the Chicago Mercantile Exchange located in Chicago, Illiniois by using the

Globex a global trading Platform that was used in Iowa and generated substantial profits in Iowa

that went right into the coffers of the CME and CME Group, Inc.

26.  In addition, upon information and belief, Defendants   U.S. Bank, N.A., and

JPMorgan transferred customer funds including funds of these Plaintiffs herein from there banks

in Iowa to CME and CME Group, Inc. for trading purposes.  Such purposeful transfer of funds

from Iowa to Illinois also demonstrate defendant CME and CME groups gain of substantial

profits from the state of Iowa from Iowans doing business with CME through their agents

including brokers and investment managers.

27.  Although CME is involved in running the exchanges, upon information and

belief, its parent CME Group provides the data pertaining to futures and options trading.

28.  All trading operations are carried out  through the CME Group Inc.'s Market Data

Platform and the CME Group, Inc.'s Globex Platform for trading that is available on the CME

Group, Inc.'s website.

29.  As such, CME and CME Group derive substantial income from the State of Iowa regarding its business of trading, buying, selling and relaying real time data to Iowans for profit and did so during the relevant time frame from 2007 to 2008.

30.  Because CME has merged with CME Group, Inc. it derives substantial monetary benefits from CME Group, Inc.

31.  CME clearing members use the CME exchange to trade options and futures including the Clearing Member reasonable for implementing the trades on behalf of PFG and Plaintiffs.

32.  CME advertises its products on the CME Group website to customers in the State of Iowa.

33.  During the relevant time frame, CME provided the market data to PFG and other brokers in Iowa thus allowing the Plaintiff's trades to be performed.

34.  As such, based on the highly interactive websites including the Globex that were located and set up in the State of Iowa that generated substantial revenue, profits, fees and other benefits for CME and CME Group , Inc., based on trades in the amount of $215 million dollars from PFG located in Iowa, both general and specific jurisdiction over CME and CME group comports with the due process minimum contract test.  See  Zippo Mfg. Co. vi Zippo Dot Com, Inc., 952 F. Supp. 2d 1119, 1125-26 (W.D. PA. 1997.)

35.  Because the reach of CME and CME Groups' commercial activities through its highly interactive websites including the Globex reached inside Iowa, was intended to reach Iowa, and generated substantial profits for these Defendants, both general and specific jurisdiction is satisfied since these platforms were directly related to Plaintiffs' trading activities over the CME through CME Group.

**Unnamed Co-Conspirators**

36.  The other unnamed co-conspirators are Russell Wasendorf, Sn., Russell Wasendorf, Jr., N.A., Millenium and many others upon information and belief who allowed Peregrine and the Bank defendants and Exchange defendants to allow at least $215 Million dollars to be lost and vanish by a variety of means and methods including but not limited to: (1) transferring customer funds out of Customer Segregated Accounts in violation of Federal and State laws for non-customer and unlawful uses of segregated customer monies including personal conversions of customer money by Russell Wasendorf, Sn. and his related companies and the Bank Defendants, (2)  the payment of salaries to loyal employees,(3) the payment of banking fees, clearing fees, trustee fees, interest on loans, loan origination fees and the repayment of loans. The Scheme engaged in by Defendants allowed Peregrine to destroy Customer Accounts in a variety of ways involving the dissipation of Futures Contracts and using FOREX trading by JPMorgan.

37.     The Scheme involved creating phony and/or illegitimate trading loses in each customer's account to make it appear as though each customer had legitimate trading loses when in reality these loses appear to have been conjured up after-the-fact through agreements among and between various unnamed defendants, and with the cooperation of the Bank Defendants and/or due to conscious avoidance when each actor had a legal duty to investigate the obvious red flags pointing out such egregious misconduct. This Scheme was so perfect that it allowed each defendant to literally steal hard-earned monies from IRA funds as well over a 20 year period from 1992 to 2012.

38.     All the while, the customers were led to believe that they were merely experiencing normal trading losses in their customer account in the regular course of business and based on market risk.

39.     This Fraudulent Scheme lasted over 20 years from approximately
1992 to 2012 and included Plaintiffs' losses at Peregrine and over the CME Exchange in
September and October of 2008.(The Scheme.)

40.      For several months prior to the debacle in October, 2008, Plaintiffs were
receiving normal monthly trading statements showing that all was well in their accounts and no
major loses had occurred.

41.     The named and unnamed conspirators all had a community of interest
in reaping profits from each corporation's interrelated conduct and community of purpose to take
advantage of unwitting members of the investing public who relied on the good faith of these
corporate giants to obey Standards of Law and Fiduciary Ethics. For example, these defendants
all reaped profits in the way of bank transfer fees, mortgage fees, clearing fees and broker fees.
These types of fees can be legitimately generated by Futures and Options tradings as well as
FOREX trading. However, in this Fraudulent scheme, these fees from money laundering
activities pretending to be legitimate fees.

42.  With respect to Futures customers, the Scheme required apparent trades to be
initiated over the CME Exchange, whereas for FOREX trading, off- exchange transactions were
also used with counter parties such as Peregrine Financial Group ("PFG" hereinafter).

43.     Under either scenario, the goal of the conspirators was to insure that the
customers' accounts were completely and intentionally destroyed so that the stolen customer
monies that were previously pocketed by Wasendorf and the other defendants would not be
apparent to the clients.

44.     These customer accounts including Plaintiffs were destroyed
by a variety of means and methods including but not limited to: ( l) the use of fictitious trades to
shadow trade the actual market to give the appearance to plaintiffs that they lost due to real

transactions, (2) trading without the requisite margin or with margin from other investors or the Plaintiffs' herein whereby each customer's account acquired positions in risky out-of-the money puts and calls that eventually lost 95% of the time, (3) manipulating the market to cause losses for the customer and gains for PFG such as in the FOREX markets. Each co-defendant played an essential role in allowing this Scheme to last 20 Years.

45. Because neither the CME nor PFG which is an FCM can actually hold segregated or separate customer monies, the role of the Depository Banks in this case Deefendants JPMorgan Chase, NA and U.S.BANK, NA (The Bank Defendants) to hold customer segregated monies was essential to accomplish this Scheme, thus eneratiing more unlawful bank fees and interest for themselves under the guise of legitimacy.

46. Because each defendant was motivated by generating exorbitant fees, they conspired and executed a plan to allow customer accounts to be eventually destroyed in the Futures and Options Markets, the OTC Metals and FOREX markets over a long period of time in excess of 10 years.

47. Each defendant acted in Bad Faith and with Conscious Avoidance of the laws and regulations of the State of Iowa and other states that were being breached, because during the course of this twenty year period, there came a time where each defendant must have realized or had constructive knowledge of what was happening around them, but despite either Actual Knowledge, or certainly constructive knowledge, each Defendant disobeyed their obligations to investigate and turned a blind eye to what was happening all around them and preferred to allow this very profitable fraudulent scheme to continue unabated at the great expense of Plaintiffs who had their life-savings dissipated, and their emotional well-being and in at least one case of Mr. Behren's, his physical well-being shattered.

48. This fraudulent Scheme can be summarized in several parts including

but not limited to:

( l) Wasendorf, Sn., Wasendorf, Jr. and a network of crooked brokers fraudulently inducing members of the public to invest in Futures and Options Contracts;

(2) The Depository Banks including defendants JP Morgan Chase and US Bank breaching Customer Segregation laws and breaching their fiduciary obligations to Plaintiffs and allowing Wasendorf, Sn. to take possession of customer segregated   monies for his own profits and personal use, and then to distribute the proceeds of this  theft to the other defendants in the form of payment of fees and interest on loans;

(3)   The purposeful destruction of customer accounts by a variety of methods involving violations of CME and NFA rules;

(4)   The Conscious Avoidance by the CME, and CME Group and Bank Defendants  who had a duty to investigate and stop the unlawful conduct by using          the CME  Emergency rules to shut down undermargined trading, but instead              CME and CME group consciously avoided confronting this 20 year fraud by setting up special Omnibus Trading rules to accommodate Wasendorf who had been undermargined for years  and CME Group allowed this scheme by allowing PFG to continue to trade over the CME although it was an undercapitalized and under segregated FCM that should have been terminated in 1992. Instead PFG was allowed to continue to conduct business over the CME Exchange to generate enormous fees for the CME and CME Group and the Bank Defendants;

(5) JPMorgan Chase Bank, NA.'s ("JPMC" hereinafter) conduct in manipulating the FOREX market in furtherance of this scheme to destroy

customer accounts and generate unlawful gains for the defendants.

**How Commodities Futures and Options Are Traded Over Exchanges**

49.     Commodities Futures Investing is quite distinct from what most people understand regarding investing in securities such as stocks and bonds.  In traditional securities markets, an investor can only lose his or her initial investment; however in options trading, an investor can lose much more.

50.     Unlike in Securities investing, the life blood of Futures and Options trading involves the use of Margin which is also referred to as Security or Cash. To enter into a Futures Contract for example, an investor must post initial margin. After the position is initiated, the investor must post maintenance margin, an amount normally less than initial margin, in his or her account until the contract is offset prior to expiry.

51.     In order to enter into a Futures or Options Contract, the investor must also comply with the terms of the contract. The CME defines the terms of each Futures Contract and defines how much margin is required to enter into and/or sustain a contract position. Each long contract requires the investor to place cash in the customer's segregated account initially held by the FCM (PFG) and the Depository Bank in customer segregated funds; or if the contract is a short sale, then cash will be received initially into the account to be off set at a later date prior to expiry of the contract

52.     Because contract values vary on a day-to-day basis, an investor may experience either Excess Margin or a Margin Deficiency in his or her trading account on a daily basis or even intra-day. Such calculations are called mark-to- market.

53.  Where a Margin Deficiency occurs, then the FCM, Clearing Member or CME itself can impose a Margin Call on the investor requiring the investor, CTA or Introducing Broker to send in cash to satisfy a margin deficiency or to liquidate positions. If the investor

ignores the Margin Call, the FCM, CME and Clearing member have a right to terminate the account usually at a great loss to the customer.

54. However, under no circumstances under CME Rule 930 may an investor initiate new trading positions, when such person is on a Margin Call or in a Margin deficiency as is what happened in this case with respect to the Scheffert's account for example, the CTA's continued trading even when the Shefferts and others were in a Margin Deficiency which makes no sense if one is trying to preserve capital, but makes perfect sense if one wants to deplete and destroy a customer account pursuant to a fraudulent Scheme.

55. The CME and CMEG instituted Rule 930 unalturistically to protect itself and understandably so because if a customer is in a Margin Deficiency or in a Margin Call and cannot or will not meet the Margin Call for more funds to be transferred into the segregated customer account, the CME, FCM or Clearing House member may unilaterally terminate the customer's account after a reasonable time has passed for the customer to act, and the CME rules even state that under some circumstances as little as one hour is a reasonable time to meet a Margin Call.

56. Despite this well-established rule CME 930, in the case of these Plaintiffs, these rules were ignored which is a red flag, because Rule 930K is to protect the CME; and the Industry almost never ignores this rule. However, this rule was ignored in this case, and the clients' accounts were traded while in margin deficits until there was no principal left at all nor a deficiency balance.

57. Thus, a fair inference can and should be drawn that there was legally violative conduct occurring whereby Wasendorf, Sn. and his brokers with the acquiescence of the Bank defendants and Exchange Defendants were actually trying to dissipate accounts down to zero as they did. Had they obeyed CME margin rules under 930 that were incorporated by reference into

their own PFG handbook, and had the CME, CMEG or the Clearing member handling the PFG Omnibus Account acted according to long standing rules and procedures, there would have been a forced cessation of trading to protect itself and preserve the Plaintiff's life-savings.

58.   Members of the investing public such as the Behrens and Schefferts should have benefited from these clear rules and therefore had these rules been obeyed, their accounts would have ceased all trading thus limiting the loses precipitously and showing the integrity of the Futures Markets, since the CME and CMEG is charged with the duty of maintaining a stable contract market for the members of the investing public.

59.   The failure to inspect PFG's accounts to observe that these accounts were grossly undermargined because PFG did not have sufficient net capital to even trade the volume of customer accounts that were being traded during the relevant time frame, is a strong indication that the PFG accounts were being traded unlawfully and in violation of CME rules requiring sufficient margin in each account to even place a trade. Thus, a reasonable inference can be drawn that there was knowledge that the CME and CME group, PFG or any counter party would not incur losses on Plaintiffs trades because these trades were in fact fictitious anyway and recorded on separate books only representing shadow trading, upon information and belief.

60.   In fact, one of the regulators the NFA filed a complaint and in the Complaint against PFG, Russell Wasendorf, Jr. Susan O'Meara and Nolan Schiff, NFA l 2-BCC-00 I dated February 8, 2012, one of the allegations against these respondents was that it failed to supervise trading accounts, and

> "[P]ermitted trades to be placed in certain PFG forex accounts for which PFG did not collect and maintain the required minimum security [margin] deposits."

61.   A Decision was entered fining PFG and the others $700,000.00 for various violations including this one. A fair inference can and should be drawn that PFG must

have been creating fictitious trades because trades cannot be placed without the proper margin or security deposits.

62.     Wasendorf and his co-conspirators certainly had the means to implement fictitious and shadow trades because CME Group provided PFG with access to the Globex which would have allowed them to track in real time actual market prices and see actual market volume so that Wasendorf just like forging NFA account verification forms could easily forge account statements to customers to make it appear that real trades had occurred in each customer account when in fact Wasendorf had already pocketed plaintiffs' monies.

63.     Because Wasendorf appears to have pocketed Plaintiffs' moneys from customer segregated accounts, reason dictates that he would have had to engage in fictitious trading for the majority of the relevant time period because had he placed legitimate trades in the Futures markets and lost customer monies as he did, the legitimate counterparties would have been entitled to receive the proceeds of these transactions rather than Wasendorf.

64.     Thus, to ensure success at the Ponzi Scheme, Wasendorf could not have risked actually putting customer money in the market, but wanted to ensure that he gained profits from his theft of customer monies64. Alternatively, to make it look like PFG was handling a large volume of customer accounts, to give the false impression that PFG was a financially sound company, when it was not and operating at a loss, some of PFG's customer trading might have been real on occasion.

65.     PFG's Omnibus Clearing member, CME, or CME Group should have seen that these accounts were grossly undermargined by overseeing Wasendorf s accounts and looking at the actual trading to see that there was insufficient margin to sustain customer positions thus requiring PFG to be suspended and expelled from the CME and CMEG.

66.     This scenario described above would have certainly been true with respect to

customer IRA accounts where the CME or PFG is estopped from suing a customer for any deficiencies in an IRA account that Plaintiffs herein maintained during the relevant time period.

67.     Ultimately whether the trades were real or fictitious or a combination of both, PFG had to set up the customers to engage in sure-fire bets that would lose, like out- of- the money puts and calls to get rid of the customers whose accounts had been used for Wasendorf's profits.

68.  Thus, Wasendorf, Sn. had to maintain a separate set of PONZI Scheme books to accomplish this Scheme, Wasendorf, Sn. had to ensure customer loses in each one's accounts eventually.

69.     As part of this Scheme the customer accounts had to be closed out,

since the monies in their  # 1845 segregated accounts ($215 million) had already been diverted by Wasendorf either by taking the cash out and using it personally or by allowing trades to go forward in the Market to generate fees for the CME, CME Group and to generate trading fees for brokers and banks.

70.  In fact, when this Ponzi Scheme was detected in 2012, there was in actuality approximately $7,000,000.00 in customer segregated monies and 14,000 customers. Therefore, there was only about $500 per customer account, too little to even be used to post-initial margin in most if not all cases. Therefore, it appears upon information and belief that the vast majority of customer accounts were shadow traded based on fictitious trading.

71.  If the customer gained a trading profit, for example, the perpetrators wouldnot have been able to close out the customer's account, as they needed to do to complete this Ponzi Scheme. Although Co-defendants could temporarily move money around if necessary as they constantly did like a shell game, eventually, the customer had to show a total trading loss

because there were no monies actually left in their accounts

72. Because of difficulty in bookkeeping with respect to 24,000 customers during this 20 year ponzi scheme, it would have been extremely difficult to track which customer's money was stolen by Wasendorf and which money was used to do actual trades. Therefore, each customer had to eventually lose and be dismissed from the market place.

73. Because the transfers from U.S.Bank and JP Morgan Chase that were stolen by Wasendorf Sn. were in round lots, the customer accounts were combined with each other and each individual customer's account balance was disregarded during these transfers. Therefore, all customers had to be eventually terminated so that this Ponzi Scheme could continue undiscovered.

74. If the customer's account actually traded and did lose money when using naked out of the money puts and calls due to natural market volatility and risk, PFG might not have had enough funds to even have been satisfy legitimate counterparties. Therefore, most of the trading had to be fictitious to avoid the situation whereby PFG would default in paying a legitimate counter party who would have had to be anonymous because all trading over an Exchange must be anonymous; and any trading off an Exchange where the counter party is known between party and the counter party is strictly prohibited under the Commodities Exchange Act (Except for Forex trading at the time which did allow off exchange transactions).      75.      By using fictitious trading, PFG avoided the risk of having to satisfy counterparty monetary obligations and could just pocket the customer stolen money for Wasendorf Sn.

76. More, evidence that these customer trades were fictitious and falsified and just represented shadow trading, off-the-books and on a set of falsified books just maintained exclusively for this PONZI scheme is evidenced in part by the fact in the Peregrine Bankruptcy Case, a document consisting of 3962 pages called "schedule F" shows that for each Guaranteed

Introducing Broker who introduced accounts to PFG and who would have and should have been entitled to fees for its introduced customer's transactions, the only entries on this Schedule F were "unknown." for the fees claimed. If no fees were being claimed for these transactions, then clearly no transactions were being entered into in real time.

77. Later on, some of these "unknown" amounts referring commissions owed to Introducing Brokers were changed to the amount of'O." However, the 110" amount fairs no better to explain why Introducing Brokers' fees were"O" but does support the inference that these accounts were not producing any fees because they were fictitious. These balance entries further lend support to an evidentiary inference that there were no actual trades to generate any fees to any brokers; hence these trades were all fictitious and off-the-books as shadow-trading only. See Portions of Amended Schedule F showing Unsecured and Non-Priority PFG claims ofIntroducing Brokers.

78. Because the PFG customer statements clearly indicate that Broker fees (and Introducing Broker fees) were deducted for each customer's trading activity, clearly the failure to claim any Introducing Broker fees in Schedule F supports the existence of a complete fraud upon information and belief, and Ponzi Scheme because no fees were actually paid, although fees were recorded on falsified customer statement to make this Ponzi Scheme appear legitimate to the members of the public.

79. More evidence supporting a clear inference that there were no actual trading going on in this Ponzi scheme upon information and belief is demonstrated by literally numerous blank entries for customer accounts recorded on Schedule F. Because in reality there were no funds in these customer accounts, the actual recorded entries are blank; whereas the false statements sent to the customers had shadow trading entries, that were eventually dissipated to zero to match their actual accounts due to the Ponzi Scheme and recorded on Schedule F.

80.  Alternatively, had these trades been real, someone other than the customer's must have been posting margin and must have somehow ensured that PFG was also the counter party on these Exchange trades. This alternative scenario would also establish extreme violations of law, since all trading must be anonymous over the Exchange.

81.  With respect to the FOREX customers that were also subject to this PONZI Scheme, these transactions were at the times in 2008 off- exchange (unlike Future contracts which are only over an Exchange) and between counter parties. The only way for this Scheme to work with respect to the FOREX investors would be to ensure that PFG was the counter party to all of PFG customers' transactions; and in fact, this Scheme was set up to ensure that PFG was the counter party for each FOREX transaction.

82.  To set up PFG as the dummy counter party to all of its customer's FOREX transactions, JPMC co-defendant and co-conspirator herein entered into a Foreign Exchange and Bullion Authorization Agreement, ("FEBA Agreement" hereinafter) the last version of which is annexed hereto as Exhibit 3.

83.  Under this FEBA Agreement JPMC would allow PFG to act as the counter party for all FOREX transactions with PFG customers. Except it was JPMC not PFG who was a FOREX dealer and prime broker, and it was JPMC not PFG who had the actual expertise in trading FOREX currencies including an entire expert trading desk at JPMC devoted to FOREX. PFG was only an FCM with no ostensible expertise in trading Foreign currencies, and did not appear to have a FOREX desk devoted to Foreign Exchange transactions upon information and belief; and had to rely on JPMC for FOREX trading advice to serve as a Counter party for PFG customers in FOREX transactions.

84.  In effect, upon information and belief, JPMC set up PFG to be the counter party but was in effect just a pass through to JPMC who was the actual Prime Dealer and Prime Broker

making the POREX market on behalf of its co-conspirator PFG.

85.   So, in furtherance of this Scheme and with the expertise and assistance of co-defendant JPMC, PFG became quite a successful FOREX counter party and profited handsomely on its FOREX transactions with its FOREX customers; and approximately 77% of the time PFG was successful

86.   While JPMC was helping PFG with FOREX trading and set them up as pass through dealers, from 2003 to 2013 and during the relevant time period JPMC was also allegedly manipulating the FOREX market, and thus JPMC knew exactly which way these FOREX trades would end up due to market manipulation of the FOREX market, and upon information and belief shared this knowledge with PFG again because these co-conspirators knew that to accomplish their Ponzi Scheme, they had to ensure that the customers would be on the wrong side of the trades and experience a total loss in their FOREX accounts as well as Futures accounts.

87.   When a Class action was instituted involving market manipulation of the FOREX markets in *In Re Foreign Exchange Benchmark Antitrust Litigation*, 13-CV-7789 (S.D.N.Y. 2013), JPMC and its parent JPMorgan Chase & Co., not PFG was named as a party-defendants for actively manipulating the FOREX market and settling prices unlawfully through private chat rooms among dealers.

88.   JPMC and its parent JPMorgan Chase & Co. acted as one and shared responsibility for all FOREX trading upon information and belief.    Now they are being asked to bear the responsibility for these plaintiffs's loses as well.

89.   Eventually JPMorgan Chase & Co. on behalf of itself and its subsidiaries and affiliates entered into a Plea agreement with the Department of Justice on May 19, 2015.

90.   However, because PFG knew that it could destroy customer FOREX accounts due

to the unlawful knowledge and information shared with it by manipulating the market, this Scheme was a surefire way to make sure that PFG could reduce the previously stolen customer accounts proceeds to zero in a tidy fashion.

91. JPMC made hefty fees acting as a Forex prime broker for PFG and claimed $77,462.10 in Forex fees for the one month of June, 2012, for example.

**Customer Segregated Accounts are Fundamental To Futures and Options Trading**

92. Futures and Options Customers hold cash funds for investing in Customer Segregated Accounts. These Segregated Customer accounts are required to be carefully protected under Section 4(d)(b) of the Commodities Exchange Act, (the "Act") codified as 7 U.S.C. § 6(d)(b) and 17 C.F.R. §l.20(a).

93. Customer Segregated Accounts are customer monies that are deposited in Banks (Depositories) to be held for the sole benefit of the individual commodities investor such as . Plaintiffs herein. Such Customer Segregated Funds cannot be used for any other purposes other than for the customer's investments in Futures and Options markets.

The Handling of Customer Segregated Accounts by the Commodities Futures Professionals

94. Plaintiffs' Customer Segregated Funds were handled in part by Peregrine Financial Group, Inc. "Peregrine" hereinafter or "PFG") who was authorized to handle these Customer Segregated Accounts by virtue of the fact that Peregrine was a registered Futures Commission Merchant ("FCM") duly registered with the National Futures Association.

95. The National Futures Association is a Not-For-Profit Registered Association that assists the CFTC in regulating the Commodities Industry in part by requiring commodities professionals be registered with the NFA in order to participate in this industry as a professional.

96. Futures Commission Merchant is defined in relevant part under the Commodities Exchange Act, 7 U.S.C. §la(28) as "a individual, association, partnership, corporation,

ortrust-that is engaged in soliciting or accepting orders for the purchase or sale of a commodity for future delivery; a security futures product, a swap, any agreement. .. and any commodity option authorized under section 6c of this title."

97.   Although a Future Commission Merchants ("FCMs" hereinafter) can buy and sell future and option contracts for customers and settle trades on behalf of customers, FCMs do not hold customer money.   Rather, FCMs such as PFG establish accounts with Commercial Banks in which to deposit and hold customer monies and act as a Depository for Customer Monies.

98.   Where customer monies are held by a Bank depository funds are called Customer Segregated Funds and must be used only for the customer's benefit.

99.   In order to establish a Commodities Trading Account at an FCM, a customer is typically introduced to the FCM by what is known as an Introducing Brokers and fees are exchanged with introducing brokers in connection with customer trading. Introducing Brokers are defined under§ l(a)(3 l) of the Commodities Exchange Act ("CEA" hereinafter) in part as any persons who engage in soliciting or accepting orders on behalf of commodities customers."

100.   Introducing Brokers are either guaranteed by the FCM and such brokers are called "Guaranteed Introducing Brokers" ("GBis" hereinafter); whereas other Introducing Brokers are referred to as Independent Introducing Brokers ("IIB" hereinafter).

101.   Customer Accounts of Guaranteed Introducing Brokers are guaranteed by the FCM, so that if a Margin Call occurs and the customer fails to satisfy the Call, the FCM will transfer funds to shore up a short fall; whereas Independent Introducing Brokers, have the requisite net capital to satisfy all customer obligations including the ability to satisfy a customer margin call.

102.   During the Relevant Time Period, PFG conducted business with approximately

113 Guaranteed Introducing Brokers throughout the United States. PFG also had relationships with Independent Introducing Brokers such as Brewer Futures Group, Inc.

103. These numerous Introducing Brokers would bring customer accounts into PFG to be traded by CTA, Commodity Trading Advisors.

104. PFG could also introduce customers directly to itself through PFG Best which is equivalent to an Introducing Broker.

105. In addition to the Introducing Brokers, these Plaintiffs were solicited by CommoditiesTrading Advisors, ("CTAs" hereinafter) unnamed co-conspirators, Garlon Maxwell, Amber Maxwell and Perry Comeau who in this case were unregistered during the relevant time period.

106. A Commodities Trading Advisor is defined in relevant part 22 under 7 U.S.C.§ l(a)(l2) as any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings or electronic medical as to the value of or advisability of trading in inter alia futures contracts and options.

107. Commodities Trading Advisors cannot settle trades, but can only place trades through FCMs who is authorized to settle trades for customers.

108. The segregated funds at issue in this Action were stolen from plaintiffs, upon information and belief from 2007 through 2008. After these funds were stolen, Wasendorf Sn. and his cronies and co-conspirators gave instructions to their trading advisors and other Introducing Brokers, and agents who had control over plaintiffs' customer account especially during the time when margin calls were issued during the week of October 2, 2008 through October 8, 2008. Those defendants charged with the handling of plaintiffs' accounts including the notification of their Margin Calls purposefully took action to terminate each customer's account by failing to even tell the plaintiffs that their accounts were in a margin

deficit on a timely basis so that each customer ended up with a zero balance or a deficient balance whereby the customer owed the PFG money in the end.

## JURISDICTION AND VENUE

109. This action is a diversity case brought pursuant the Diversity Provision of Federal Rule of Civil Procedure, 28 U.S.C. §1332(a)(l), Et. Seq. Plaintiffs are all citizens of Iowa and Defendants are non-Iowans.

110. This Court has subject matter jurisdiction over this Action based on diversity of citizenship.

111. This Court has general personal jurisdiction over the Banking Defendants JPPMorgan Chase, Na and U.S. Bank, NA. since each bank has branches in Iowa and each defendant is registered to accept service of process in Iowa thereby doing business in the State of Iowa and consenting to personal jurisdiction pursuant to the Due Process Clause and long-arm jurisdiction. See Iowa Rule of Civil Procedure 1.306;

112. Personal jurisdiction is also being alleged over CME whereby CME purposely availed itself To plaintiffs in the State of Iowa by doing entering into contracts with Plaintiffs' agent PFG and used other agents to solicit Plaintiffs' business in the Staet of Iowa. Personal jurisdiction is also being asserted based on Plaintfss as third praty beneficiaries of contracts entered into by CME and PFG to be performed in the Stae of Iowa or over the GLobex an Electronic Trading Platform that is global in nature. *See Paragraphs 11-35 supra.*

## THE PARTIES and RELEVANT NON-PARTIES

### Plaintiffs

113. Plaintiffs Sherri Sheffert and David Scheffe1t, Bruce Behren and Kathy Behrens reside in Iowa. Both couples have been married for over 50 years.

114. In August of 2007, the Shefferts in their 60s, and wanting to retire with a steady

income invested their entire nest egg, representing their entire life savings with defendants by opening three accounts with Peregrine Financial Group. which were purposefully lost in this RICO Ponzi Scheme in one week, during the week of October 2, 2008 to October 9, 2008.

115. The Shefferts accounts were as follows during the relevant time period.

**Sub-Account number**

| | |
|---|---|
| Sherri Scheffert IRA 30700 | $185,843;10 |
| David Scheffert IRA 3070 | $130,253.27 |
| David and Sherri Scheffert joint account | |
| 30708 | $47,715.00 |
| Total: | $363,811.37 |

116. As soon as BFG, Millenium, Perry Comeau, Garland Maxwell and Amber Maxwell convinced these Plaintiffs to transfer their commodities trading accounts which were doing just fine from 2005 to 2007 from their previous FCMs, Crossland (and prior to that the group's accounts were held by the PCM Interactive Brokers), BFG and/or PFG gave the customers written instructions to send their customer funds to Peregrine's Customer segregated account at JPMorgan Chase, NA account number ending in 5265.

117. Because Plaintffs were investing in Derivative Contracts they were

instructed to send their monies into JPMORGAN's #5265 customer segregated account; however the instruction sheet had separate instructions for investors who desired to trade FOREX contracts which relate to contracts based on currencies and Foreign Exchange.

118. Therefore, upon information and belief, FOREX customer monies were kept in a separate customer account at JPMorgan, unlike regular Futures and Options Traders who kept their funds in the 5265 account at JPMorgan and the l 845 account at US Bank. Both

Accounts were for the benefit of Peregrine Customers including their IRA monies as well.

119.    Plaintiffs transfers into the JPMorgan 5265 account were made in approximately September, 2007, right at the height of the unlawful 20 year PONZI Scheme.

120.    These transfers into the Peregrine Customer Segregated account 5265 held at JPMorgan Chase, NA during the relevant time frame did not just go into the 5265 account as one aggregated transfer, rather these accounts each had their own sub-account number corresponding to the owners of each account. So, for example, the Shefferts had three sub-accounts, including

each one's lRA monies sent in to JPMC with Millenium's stamp of approval as IRA Trustee/Custodian.

121.    The Shefferts' also had a non-irajoint account representing their other life savings as husband and wife over a life time of savings and this account also had a separate sub-account number.

122.    The three sub-account numbers corresponding to each one's account were 30070, 30071 and 30078.

123.    Each of the other Plaintffs also had their accounts transferred to the JP Morgan, NA customer Segregated Account #5265 with conesponding sub-account numbers.

124.    Therefore, when JPMorgan received these monies, it was clear that these monies were customer monies and related to individual sub-accounts including IRA monies.

125.    These sub account numbers were required by the written records requirement of the CEA which requires records to be kept in connection with customer segregated accounts as well as Commodities Futures Trading Accounts held at FCMs.

126.    Kathleen and Bruce Behrens, husband and wife, also residents of Oelwein, Iowa invested their life-savings with defendants in what they perceived to be conservative and safe

investments by opening up an account with Peregrine, introduced by Brewer Financial Group and Millenium Trust to be managed by Garlon Maxwell, Amber Maxwell, with the assistance of Perry Comeau, in Iowas all unregistered trading agents with cease and desist orders against them issued by the State ofIowa, directing these individuals to stop trading investors' accounts.

127.     Kathleen and Bruce Behrens also had three sub-accounts established at JPMC. Mr. Bruce Behrens was retired from owning a company called Culligans Water Company where he conditioned water. Both he and Mrs. Behrens were High School graduates as well.

128.     Mr. Behrens had served in the Military after graduating from High School and then got involved in a private business concern until he retired and sold his business.

129.  The Behrens also invested their entire life savings in the amount of approximately $202,061.60 as follows:

Kathleen Behrens IRA:

Original Investment          $52,340.4

Bruce Behrens IRA:           $36,809.13

Bruce and Kathleen Behrens Joint:  $112, 912.00

Total:                       $202.05 1 .60

130.     The Plaintiffs already been investing in futures and options contracts since 2005 where Garlon Maxwell and Amber Maxwell with the assistance of Perry Corneau charged a 22% incentive fee.

131.     The Oelwein Plaintiffs believed that only l 0% of their principal was at risk at any given time based on these trading strategies.

1. Only after the CTAs (Commodities Trading Advisors) convinced the Plaintiffs to transfer their accounts to PFG, did the severe losses in their trading accounts begin, because the C TA's strategy had changed and now they were

-25-

co-conspirators in this PONZI Scheme.

2. As such, now these CTAs were not looking to preserve capital for these plaintiffs, but rather upon information and belief they were instructed to and agreed to knowingly destroy capital, and then Wasendorf, Sn., the CTAs, Brewer and others would divvy up the customer's accounts among themselves.

3. During the week of October 2, 2008 through October 9, 2008, Plaintiffs' entire investments were wiped as a result of defendants' failure to safeguard these customer segregated accounts.

4. During the week of October 2, 2008 through October 8, 2008, each plaintiffs' account fell into a margin deficit triggering a margin call. However, defendant CME group through its agent CME purposefully failed to properly notify plaintiffs of these margin calls or losses in each one's account in a timely manner as mandated by CME Rule 930E which also requires margin call notices to be made within one business day. Had each plaintiff been notified, by telephone on October 2008, the next day after the Margin Call was first issued, each would have closed his or her account thus preserving most of the assets which were not fully dissipated until October 8, 2008.

132. However, to make sure that plaintiffs had no chance to save any of their assets which had to disappear as per this Ponzi scheme, plaintiffs did not even have the protection of the CME rules which were apparently suspended when it came to allowing this Ponzi Scheme to flourish, wiping out these investors' life savings.

133. To make matters worse, The CME and CME Group did not exercise their emergency powers to stop this untoward trading. The CME rules which prohibit all trading during a margin call except for liquidation only trades. CME Rule 930D. Rather, during this one

week period of the undisclosed margin calls, the CME and CME Group allowed trading to continue to bleed plaintiffs' account down to zero. For example, the Shefferts' accounts continued to be actively traded in violation of the CME rule 9300 and new positions were initiated on October 2, 2008, October 3, 2008 and October 6, 2008.

134. The CME and CME Group allowed losses to occur in each plaintiffs account by allowing the selling of naked puts and/or naked calls in each plaintiffs account during the volatile week of October 2 through October 8, 2008, not just using 10%, but 100% of each clients' monies which ensured a total collapse of each account.

135. It is well-settled in the Commodities Futures Industry that naked puts and calls will cause losses 95% of the time. So, this strategy was a perfect strategy to wipe out plaintiffs' remaining account balances so that Wasendorf Sn. and his co-conspirators could nicely reconcile their books after having previously pocketed the investment funds in plaintiffs' accounts with the cooperation of JPMorgan Chase and U.S. Bank.

136. CME and CME group should have had rules in place to prevent what happened here which is contrary to the stated goals of the CME and the CME group to ensure the integrity of the commodities markets.

137. Now both books of the ponzi scheme showing plaintiffs' actual balance (a zero balance) due to Wasendorf Sn. and his cronies pocketing the plaintiffs' life-savings by dipping into customer segregated accounts and the actual customer money for investments in their customer accounts all ended up with zero balances, making this the perfect crime.

**Non-Party Co-Conspirators**

Russell R. Wasendorf, Sn,

138. Russell R. Wasendorf Sn. was the CEO and owner of Peregrine Financial Group (PFG) since he first created the company Peregrine Financial Group a/k/a PFG Best in

approximately 1990 when this Ponzi Scheme first commenced upon information and belief. He was registered with the National Futures Association ("NFA II hereinafter") as a principal and an associated person of PFG since 1992 under NFA Ids 0049753 and 0089948.

139.    Russell R. Wasendorf Sn. currently resides in Terre Haute, Indiana, upon information and belief in a Federal Penitentiary. He is serving a 50 year sentence, the maximum, for his participation in stealing customer funds out of these segregated customer accounts.

140.    Upon information and belief, he would never have been able to accomplish this heinous scheme without the acquiescence of co- defendants of JPMorgan and U.S. Bank, Millenium, the CTA's, Steven Brewer the CME and CME Group and many other John Does.

141.    When he attempted to commit suicide on or about July 9, 2012, he left a self- serving suicide note stating in relevant part: "I have committed fraud." However, he did not go far enough because he tried to arrogate to himself this entire fraud, when there were many John Does with the requisite intent and knowledge to share the blame upon information and belief.

142.    Peregrine Financial Group, LLC. ("PFG" hereinafter) was an FCM during the relevant time period. During the relevant time frame, PFG was a major FCM and one of the largest non-bank FCM's in the United States. During the relevant time frame, PFG had approximately 24,000 customers who maintained customer segregated accounts or customer separate accounts. U.S,Bank N,A,

143.    U.S. Bank N.A. is a nationally chartered bank organized under the laws of Delaware with its principal place of business in Minneapolis, Minnesota. U.S. Bank maintains an ATM machine and bank branches in this district, upon information and belief. The "U.S. Bank" name has been used since 1891 and, since that time, as a result of a series of mergers and

acquisitions, has covered an increasingly large number of banking institutions.

144. U.S. Bank's parent company, U.S. Bancorp, was formed on or about February 27, 200 l, when Firstar Corporation purchased U.S. Bankcorp. Although Firstar was the surviving company, the combined entity changed its name to from Firstar to U.S. Bancorp.

145. Prior to doing business with US Bank, PFG did business with Firstar, US BANK's successor-in-interest by Merger. Defendant U.S. Bank is liable as a successor in interest for the conduct of Finstar.

146. U.S.Bank entered into a Consent Order dated February 4, 2015 in which it consented to the accuracy of the Facts in the Summary Judgment Order of Judge Linda Reade regarding its role in the Wasendorf Ponzi Scheme. See CFTCv. US. Bank, NA., Consent Order, 6:13-cv-02041-LRR, Doc. #147 (N.D.IA 2013.) The facts to which U.S. Bank, agreed to regarding their role in this Ponzi Scheme are described in the Summary Judgment Order of Judge Linda Reade. See C.F.T.C. v. US. Bank, NA., 13-cv-2041-LRR,

Docket Entry# 112 (N.D. IA 2013.)

147. According to the U.S.Bank-CFTC consent order, U.S. Bank cannot deny any of the facts consented to in any public fornm such as in this instant lawsuit.

JP Morgan Chase Bank, N.A.

148. JPMorgan Chase Bank, N.A. (""JPMC" hereinafter) is a nationally chartered bank that is organized under the laws of Delaware with its principal place of business in New York, New York. JPMC maintains several ATMS and branches in this District, upon information and belief. PFG maintained at least 36 accounts at JPMorgan, including at least one customer segregated funds account. JPMorgan's parent company JPMorgan Chase & Co., is an amalgan1ation of over 1200 predecessor entities including the Chase Manhattan Corporation and J.P. Morgan & Co. which merged in December 2000. On or about July 1, 2004, JP Morgan

Chase & Co. acquired the Bank One Corporation including Bank One's subsidiary, Bank One, N.A., which combined with JPMorgan. Defendant JPMorgan is liable as a successor in interest for the conduct of Chase and Bank One.

149. JPMC is a wholly owned subsidiary of JPMorgan Chase & Co. JPMorgan Chase & Co. is a Delaware Corporation headquartered in New York, New York. JPMorgan Chase & Co. is a global financial services company and bank with $2.6 trillion in assets as of December 31, 2014. JPMorgan Chase & Co.'stock is traded on the New York Stock Exchange (JPM ticker symbol.)

**Futures and Options over the CME Exchange engaged in by PFG on behalf of PFG and its customers.**

150. In exchange for these prime brokerage fees, JPMC received fees from PFG.

151. As of the date of the filing of the Peregrine Petition in Bankruptcy, JPMC claimed fees outstanding in the amount of $94,185.08 in FX Fees.

152. Upon information and belief, JPMC engaged its affiliate JPMorgan Securities, LLC. ("JPMS" hereinafter) to act as the Clearing Member to effectuate all FX trades and Metals Trades over the CME and NYMEX Exchanges.

153. JPMorgan Securities, LLC. ("JPMS" hereinafter) is and was at all times hereinafter mentioned upon information and belief a Clearing House Member duly registered with the CME as a clearing house member.

154. JPMorgan Securities, LLC is also a wholly-owned subsidiary of JPMorgan Chase & Co., and is a limited liability Company. JPMS is registered with the Securities and Exchange Commission as a broker-dealer and has been registered since 1985 and as an investment advisor since 1965.

155. CME also had a banking relationship with JPMorgan Chase, NA who held

accounts for the CME and therefore monies were constantly being transferred back and forth from the CME and CMEG to JPMorgan CHASE, NA. and between JPMORGAN CHASE, NA, US BANK, NA, PFG and CME in connection with the exorbitant fees generated by PFG and as a result of this Racketeering Conspiracy.

156.    CME and CMEG also had a relationship with JPMorgan Securities, LLC. who was during the relevant time period was the Clearing House Member who cleared Future transactions over the CME Exchange.CME and The CME Group, Inc,

157.  At all times hereinafter mentioned upon information and belief, The Chicago Mercantile Exchange Inc. (the "CME") is a Delaware Corporation which its principal place of business in Chicago, Illinois.

158. The CME or Chicago Mercantile Exchange is a registered Board of Trade and designated contract market as defined under the Commodities Exchange Act, 7 U.S.C. § 7, Et. Seq.

159.  The CME is a wholly-owned subsidiary of The CME Group, Inc.

160.  The CME was acting as an agent on behalf of its principal, the CME group.

161.  The CME Group, Inc. (The "CME Group") is a Delaware C Corporation with its principal place of business in Chicago, lllinois.

162.   Defendant the CME Group also owns and operates a variety of Contract Derivative Markets including: The Chicago Board of Trade (the Comex or CME), the New York Mercantile Exchange (NYMEX), and the Kansas City Board of Trade.

163. The CME Group, lnc.'s total revenue for 2016 was $3.4 billion dollars and Net Income was $1.5 billion dollars in 2016.

164.  The CME Group, Inc. is a publicly held corporation and is traded over the NASDAQ under the ticket symbol CME.

165.    Both The CME Group and its subsidiary, the CME are for profit C corporation whose duty to its Shareholders is to maximize shareholder value. (Collectively referred to as CME or CME defendants.)

166.    The CME Group runs the COMEX where Plaintiffs lost their life savings.

167.    The CME Group, Inc. has established the CME Rule book which applies to all of its Boards of Trade including the CME.

168.    The CME Group has harmonized all of the Rules of the other contract markets including the CBOT, NYMEX nd CME into one Rulebook "making the rules parallel in structure, numbering, and language where possible." (Quoting from the CME Website/Rulebooks.)

169.    The CME Group wholly owns and operates the CME along with the NYMEX and CBOT.

170.    The CME Group is a C Corporation and has not been registered with the CFTC as a board of trade or designated Contract Market pursuant to 7 U.S.C. § 7, Et. Seq.

171.    Upon information and belief, the CME Group has never made application to the CFTC to comply with 7 U.S.C. § 7.

172.    The CME Group has a Market Regulation Department that monitors and surveils the CME to ensure that the CME fulfills it self-regulatory responsibilities.

173.    The CME Group's Market Regulation Department controls all aspects of the CME's business operations including all trading activities.

174.    The CME Group has access to all of the CME's computers and can monitor in real time all trades occuring over the CME Exchange.

175.    The CME Group, Inc. acts on behalf of the CME.

176.    The CME acts on behalf of the CME group.

177. These two corporations are alter egos of one another, upon information and belief.

178. The CME Group on behalf of itself and the CME entered into the Co-Location Agreement on behalf of the Chicago Mercantile Exchange. See Co-Location Agreement between CME Group and PFG.

179. The CME Group. Inc. manages and controls the CME and runs the CME like a Division.

180. Defendant CME is also a board of trade registered and approved by the CFTC to act as a Contract Market under 7 U.S.C. §7, et. seq.

181. As a registered contract market pursuant to 7 U.S.C.§ 7, the CME has a duty to maintain a stable contract market free of manipulation and fraud.

182. The CME Group has a duty to maintain a stable contract market free of manipulation and fraud.

183. Upon information and belief, a conflict of interest exists between the CME Group's obligations to collect as much in fees as possible to maximize shareholder value as would any C corporation, and its subsidiary, the CME's obligation to maintain a fair and stable contract market which would have required it to kick out PFG many years ago as a customer of the Exchange, since PFG was under capitalized and under segregated at all times during its 20 year relationship at the CME.

184. To generate profits, the CME charges Exchange Fees for the privilege of trading over the various CME Group Exchanges.

185. In addition, in order to maintain its Status of an approved Contract Market, the CME is required to set up rules to govern and regulate the trading of futures and options contracts. This rule-making authority has been given to them by Congress and the CFTC.

186.     However, it is the CME Group, an undesignated contract market that has never been approved by the CFTC as a validly designated contract market that actually regulates and controls the CME where the failure to enforce CME Rule 930 and many other rules pertaining to customer protections.

187.     Therefore, the CME Group, Inc. and its wholly owned Subsidiary Contract Market the CME wears two hats: one as a C corporation to maximize shareholder value, and the other hat as a quasi-government regulator charged with regulating the futures and options markets for the protection of the investing public.

188.     The CME Group, Inc. has developed a Rule book that governs all of its subsidiaries including the CME. This CME Rulebook governs all of the protections, operations and procedures that are used to regulate the trading and settlement of futures and options over the Exchanges as well as other derivative contracts trading over the CME and other Exchanges owned and operated by The CME Group, Inc.

189. The CME rule book only allows Clearing House Members to trade Futures and Options contracts over the Exchanges. Therefore an FCM such as PFG in order to transact over the Exchanges had to either be a Clearing House Member or associate itself with a Clearing House Member through an Omnibus Trading Account.

190. To become a Clearing (or Clearing House) member requires approval by the CME and CME Group, Inc. The CME and CME Group, Inc. require clearing members to have substantial amounts of Net Capital to support Margin Requirements. This large net capital requirement protects the Clearing House from losses based on customer defaults where a customer cannot satisfy a margin call or cure a Margin Deficiency.

191.     Every night at the end of the trading day, the CME novates each and every contract and options position onto its own books.

192.    So, the CME is the ultimate buyer and seller and owner of each and every trade performed over its Exchange.

193.    As such, each Plaintiff had a contract directly with the CME and CMEG.

194.    As a result, each Plaintiff was a third party beneficiary of any contracts made with the CME on behalf of each Plaintiff.

195.    As a result, the CME and CME group had an obligation of good faith and fair dealing that attaches to each written or unwritten contract made on behalf of the Plaintiffs or for their direct benefit.

196.    The CME and CME group entered into contracts through agents of each Plaintiff In the State of Iowa.

197.    To gain admission to the CME Group, Inc.'s Clearing House Member group, requires the payment of an entrance fee, just like in a private club.

198.    If an FCM does not meet the financial requirements to be accepted as a Clearing House Member, it can still gain the status of member or operate as a non-member, upon information and belief.  A Member or Non-Member, unlike a Clearing Member, cannot clear trades itself and has to associate itself with a Clearing Member who will clear a member on non-member's trades for it. This arrangement generates fees to be paid by the Non-Clearing customer or Member to the CME Clearing House Member to clear trades on the PCM-Member's behalf and its customer's behalf.

199.    One crucial rule in the CME rulebook is Rule 930, and its subdivisions in Rule 930 D, E, and K regarding Margin requirements (referred to as a performance bond) and Margin Calls which set fort procedures which transacting parties must follow where an account is under margined, including the cessation of initiating new positions until a Margin Deficiency is resolved.

200. The CME and CME Group made material representations to the members of the public including Plaintiffs herein that they would monitor and surveille the market actitivies of their customers trading over the CME Exchange.

201. In the CME Clearing Risk Management and Financial Safeguards publication offered to the public, the CME Group stated that its surveilles the CME through another wholly owned subsidiary, CME Clearing.

202 CME Group stated: "CME Clearing's integrated clearing function is designed to ensure the safety and soundness of our markets."

203. CME Group does not just monitor Clearing members but also has access to Clearing member's large individual customer accounts and monitors those accounts as well, upon information and belief.

204. CMEG has stated on page 16 of its handbook entitled CME Clearing Risk Management and Financial Safeguards:

"Through CME Group's Market Regulation department, CME Clearing's Risk Management team has access to specific account position information for Clearing Members' large individual customer accounts. Such position information which is maintained on a highly confidential basis, allows the identification of concentrated positions as they arise and the agggregation of positions that may be owned by common principals through several different Clearing Members.

205. During the relevant time period, CME clearing had full access to inspect and monitor the trades that were being conducted by PFG, a non-clearing PCM.

206. During the Relevant time period, PFG was considered a large individual customer or equivalent to a large individual customer and CME clearing was required to monitor PFG to determine whether PFG held large concentrated positions as pait of its standard market

regulation. 207. CME and CME Group during the relevant time period had access to the account positions maintained by PFG and could actively monitor PFG's positions in real time.

208. Defendant CME and CME Group also acted with Conscious Avoidance in refusing to investigate the clear red flags that showed that these trading activity over their Exchange was completely unsuitable and in violation nof their own rules.

209. CME and CME Group also violated principals of good faith and fair dealing by allowing IRA money to be used in future trading over their Exchanges. CME and CME group knew or should have known that it would be impossible for any customer to satisfy a margin call in excess of $5,000.00 because under IRA rules, $5000.00 was the annual maximum contribution ($8,000.00 today) that one could even make into an IRA account. Thus, CME and CME group should not have accepted these investors to proceed without any warnings that their accounts could easily be destroyed if a margin call exceeded $5,000.00. This conduct shows malicious intent based on Conscious Avoidance on behalf of CME and CME Group in allowing these IRA investments at PFG, CME and CME Group also failed to ensure that members of the public such as Plaintiffs understood in written documents that PFG was a non-clearing member that needed to associate itself with a clearing member.

210. CME and CME group also allowed brokers such as Plaintiffs' brokers who had been fined and were not allowed to act as investment advisors in the State of Iowa to nevertheless operate as CTAs and advise investors and make trading recommendations involving the exchanges. In spite of these cease and desist orders against Plaitnffs brokers, these brokers were allowed to continue to represent the plaintiffs in connection with their trading activities over the CME and CME Group Exchanges.

211. CME and CME Group also allowed introducing brokers and CTAs to conduct business involving their exchanges who were not in good standing with the NFA.

Russell Wasendorf, Jr.

212. Russell Wasendorf, Jr. resided in Orlando, Florida. During the relevant time frame, he was Chief Operating Officer and President of Peregrine Financial Group and participated in this Conspiracy in this ponzi scheme.

213. In May, 2011 a few months before the collapse of Peregrine, Russell Wasendorf Jr. was fined $700,000.0 along with PFG, Susan O'Meara and Eric Schiff for violating a variety of NFA rules relating to misconduct with respect to allowing this Ponzi Scheme to flourish. See NFA order dated February 8, 2012, NFA Case N. 12-BCC-001 This fine was paid in full. See NFA BCC Decision annexed hereto as Exhibit I 0.

214. Included in the violations committed were a variety of misconduct that shows that this ponzi scheme was in full force such as allowing customers to invest in risky out of the money puts and calls that are bound to lose 95% of the time as well as placing trades without sufficient margin.

215. As Chief Operating Officer and President of PFG, Wasendorf, Jr. was charged with knowing the financial position of PFG which turned out to contain fraudulent information including FR-ls filed on a monthly basis with the CFTC showing PFG's capitalization and the amount of customer segregated funds on hand, upon information and belief. It was part of Russel Wasendorf Jrs' role as President of PFG to monitor cash positions and financial statements of PFG, and he is charged with knowing the true financial position of PFG.

216. Russel Wasendorf, Jr. also personally guaranteed his Father's loan from U.S. Bank in the amount of $9,000,000.00 in 2008. Russell Wasendorf, Jr. brought a lawsuit against U.S. Bank claiming that U.S. Bank defrauded Russel Wasendorf, Jr., RusselWasendorf Jr. but mysteriously dropped that law suit.

217. As president of PFG, Wasendorf, Jr. ran the day-to-day operations of PFG and

had to sign off on many documents which would have revealed the fraud or at least the vast undersegregation that existed in customer segregated accounts.

218. Therefore, as president, Wasendorf, Jr. had a duty to immediately stop the conduct but based on conscious avoidance continued to aid and abet his father, Wasendorf, Sn.

Paul William Thomas.

219. Attorney Paul William Thomas resides in the State of California.

220. During the relevant time period, Paul William Thomas represented both CTA and Investment Adviser Perry Comeau and Plaintiffs herein before the National Futures Association with respect to each Plaintiffs' customer arbitrations that were conducted from approximately 2009 to 2011. This NFA proceeding did not result in a recovery for plaintiffs.

221. Attorney Paul Thomas, Esq. met with plaintiffs in their home state of Iowa to solicit their business and was retained by plaintiffs to pursue their claims for compensation against PFG before the NFA based on a claim of lack of risk disclosure and other claims unrelated to the Ponzi Scheme announced by Wasendorf. Sn. In July of 2021 during a suicide attempt.

**National Futures Association**

222. The National Futures Association is a Registered Futures Association pursuant to the Commodities Exchange Act 7 U.S.C.§ 21.

223. The National Futures Association is a not-for-profit corporation incorporated in the State of Delaware that serves as the only registered futures association established pursuant to u.s.c. § 21.

**PROCEDURAL HISTORY**

**Recent Procedural History**

224. Plaintiffs instituted a case on or about July 11, 2016 in the Southern District of New York entitled Behrenes v. JPMorgan, Et. Al., 16-cv-5508 (S.D.N.Y.July 11, 2016), aff'd, 21-2603 (2nd Cir. March 13, 2024). Defendants Cross-Appealed to dismiss the State Law Claims on the merits; however the lower comi's rejection of this attempt was also affirmed on appeal. See Behrens v. JPMorgan, Et. Al., 21-2651, 21-2660, 21-2661, 21-2662 *2nd Cir. 2024.)

225. Although the Federal Claims were dismissed based on the Statute of Limitations defense, the State Law pendant claims were dismissed without prejudice. Despite an attempt by defendants to dismiss the State law claims with prejudice, their cross-appeal failed allowing the state law claims to proceed.

226. Therefore, under the savings clauses in existence pursuant to New York Civil Practice Law and Rules Section 205 and Iowa Code Section 614.10, the pendant state law claims are being continued.

**Prior Procedural History**

227. U.S. Bank and J.P. Morgan settled a Class Action in the approximate amount of $44 million dollars to cover 14,000 purported Class members who had opened accounts at Peregrine as of July, 2012 and lost their proceeds in only part of this RICO Ponzi Scheme. See In Re Peregrine Financial Group Customer Litigation, 12-CV-5546 (N.D.Ill. 2012). Although this case includes the claims from the prior class action, this case also makes more detailed allegations in describing the entire ponzi scheme whereas the Prior Class Action focuses on one part of the ponzi scheme. The prior Class Action eventually excluded the Plaintiffs who timely filed notices of claims.

228 The Settlement Class eventually included 4(d) customers who actually owned

money, property or securities at the time Peregrine went bankrupt on or about July 10, 2012.

Because none of the plaintiffs herein owned money, securities or property in 2012, after having

their accounts destroyed leaving a zero balance in 2008, the instant plaintiffs were excluded from

the previous settlement.

a). The Plan of Allocation as well as the Proof of Claim forms in the previous Class action

clearly indicate that these Plaintiffs were included as Class Members who held "other clains"

and/or  "Allowed Claims."

b) Indeed according to the Commodity Futures Customer Claim Form for Peregrine

Financial Group Inc. It states in relevant part:

c)        "IF YOU DO NOT HAVE A CUSTOMER CLAIM  IN A FUTURES ACCOUNT
          PLEASE DO NOT USE THIS FORM.  SEPARTATE CLAIM FORMS MUST BE
          FILED FOR OTHER TYPES OF CLAIMS, INCLUDING FOR CLAIMS RELATED
          TO A FOREIGN EXCHANGE ACCOUNT OR A PRECIOUS  METAL ACCOUNT
          WITH PFG. PLEASE ALSO NOTE THAT IF YOU HOLD (1) A CLAIM AGAINST
          PFG BASED ON A FUTURES ACCOUNT, AND (2) A CLAIM AGAINST PFG
          BASED ON ANY OTHER RELATIONSHIP WITH PFG (SUCH AS A FOREGIN
          EXCHANGE ACCOUNT, A PRECIOUS METAL ACCOUNT OR OTHER CLAIM),
          YOU SHOULD USE THIS FORM SOLELY TO FILE YOUR CLAIM  BASED ON A
          FUTRES ACCOUNT AND USE A SEPARATE CLAIM FOR (OR FORMS TO FILE A
          CLAIM (OR CLAIMS) AGAINST PFG BASED ON ANY OTHER APPLICABLE
          RELATIONS HIP. [Sic]


(d)  In another Claim Form, it states:

          "If you have previously filed a "Bankruptcy Proof of Claim Form" and your claim has
          been allowed ("Allowed Claim") in the bankruptcy case captioned In re Peregrine
          Financial Group, Inc. Case No. 12-B-27488 ("the Bankruptcy Case"), then you do not
          need to complete this Commodity Futures Customer Claim Form- Peregrine Financial
          Group, Inc.-U.S.Bank Settlement ("Class Action Proof of Claim.)"


    229.   In this case, these Plaintiffs both had "Other Claims" and/or "Allowed Claims" but

never received any proof of claim forms and were effectively decertified from the class.

    230.    In approximately June of 2016, these plaintiffs learned that theywould not be

participating in the prior Class Settlement. Because these plaintiffs are not bona fide 4(d) customers, they have been excluded from the Class and now must bring their own cause of action.

231. Because they diligently pursued and exhausted all administrative and legal remedies their State Law Claims should be tolled based on that basis alone.

232. Plaintiffs never received any notices or other information about the Prior Class Action Settlement including opt-out notices; and therefore they are not bound by the previous class settlement, upon information and belief. Thus, these instant Class members were in effect decertified from the Prior Class Action.

**SUBSTANTIVE ALLEGATIONS**

233. Wasendorf, Sn. had to figure out a way to get rid of these very customers at Peregrine whom he had just robbed, because Wasendorf, Sn. and his co-conspirators could not just tell their customers to go away because they had no more funds to use as Margin to initiate and maintain futures and/or option positions. In furtherance of this Ponzi Scheme to protect JPMorgan, U.S. Bank, CME and CMEG who allowed this scheme to continue for over a decade and would have continued but for Wasendorf Sns' attempted suicide on July 9, 2012, Wasendorf, and his co-conspirators gave marching orders to loyal and crooked brokers who are known in the commodities industry as CTAs or Commodity Trading Advisors and IBs, Introducing Brokers, and other agents to find a clever way to purposely create losses in each customer's accounts, so that each customer would just disappear from the market place allowing Wasendorf and his co-conspirators to laugh all the way to the bank.

**Fraudulently Inducing Members of the Public to Invest in the Commodities Markets**.

234. As part of this Ponzi Scheme, it was essential that a cadre of Introducing brokers (Including Millenium Trust) and CTAs succeed in luring members of the public into the

Commodities Futures Markets to fund this Ponzi Scheme.

235.   In addition to Garlon Maxwell, Amber Maxwell, Perry Comeau, Steven Brewer, and Millenium Trust, PFG and the Wasendorfs associated themselves with over 113 other Introducing Brokers and CTAs who also lured members of the investing public into investments that were bound to fail.

236.   The  modus operandi of these co-conspirators who lured in customers into the commodities markets over this two decade period from 1992 to 2012-- where there were at least 24,000 customers trading through PFG, was simple: the brokers would fraudulently induce customers into thinking that they were investing in sound and safe investments, with limited risk, that would eventually mature over time with preservation of capital.

237.  Instead, when the time came, these brokers and CTAs would  purposefully enter into naked puts and calls such as "bull spreads: which are derivative contracts that lose 95% of the time. Therefore, these strategies of buying naked puts and calls also referred to as bull spreads are a surefire recipe for disaster.

238.  These bull spreads are allowed to be traded over the CME Exchanges by the CME Group and its agents, CME and CMEG in violation of customer protection principles.

239.  The unwitting investors believed that the brokers and CTAs had their best interests at heart because the brokers after all are ostensibly making fees linked to the success of each investor's account; however in reality, the brokers preferred to take the risk out of their fee structure which are linked to profitable trades. Rather, these brokers and CTAs purposefully dumped their clients' accounts using out-of-the money, naked puts and calls or option spreads which eventually lose  95% of the time.

240.  Because Mr. Wasendorf Sn. had already taken the proceeds from the trades out of the accounts, the accounts were actually being shadow-traded upon information and belief and

the brokers and CTA's needed to just produce a zero balance in each customer's account. Then Wasendorf, Sn. and these brokers and CTAs would divvy up the stolen proceeds.

**2005 Opening of the Plaintiffs Customer Accounts- Based on Fraudulent Inducement and Minimization of Risks.**

241. Garlon Maxwell, Amber Maxwell and Perry Comeau had convinced Plaintiffs that their trading strategy was safe and prudent and only risked 10% of the plaintiffs capital at any one time.

242. Prior to switching FCMs and Introducing Brokers to Brewer Futures Group And Peregrine Financial Group, Inc., the Maxwells and Perry Comeau had traded through two other FCMs, Interactive Brokers and Crosslands from 2005 through 2007.

243. During this time, 2005 through 2007, Plaintiffs were doing just fine and had not sustained devastating losses in their accounts. It appears that the Maxwells were adhering to their representation that only 10% of the principal was being traded at a time, thus limiting risk.

244. Garlon Maxwell did not have to go into detail about how he intended to gain profits because Plaintiffs were unsophisticated, although they did understand his clear representations that these were prudent investments.

245. Neither Garton Maxwell, Amber Maxwell or Perry Comeau bothered to tell plaintiffs that naked puts and calls are extremely risky, and they downplayed the risks of these investments.

246. Garlon Maxwell and Amber Maxwell with the help of Perry Comeau working in Iowa induced these unwitting members of the investing public to commit their life savings based on these clear misrepresentations and material omissions which constitute fraudulent inducement under horn book law.

247. Based on the downplaying of the risks of investing as well as the misrepresentation

that only I 0% of each one's funds would be invested at one time, plaintiffs proceeded to open

investment accounts at PFG. To open these accounts, each plaintiff was assisted by Perry

Comeau in Iowa who set up their accounts over the internet and helped them fill out the required

paper work which consisted of preprinted and small font boiler plate documents. Plaintiffs relied

on the verbal explanations of the Maxwells and Perry Comeau and just signed on the dotted line.

248.   P1aintiff s were not instructed to read documents, and signed documents in the

basement of Perry Comeau's home in Iowa. The documents were written in small print, and

plaintiffs preferred verbal explanations by the investment advisors whom had traveled from Utah

to Iowa to explain the details to them personally.

249.   Stated otherwise, because Plaintiffs had spent a substantial

amount of time listening to Garlon Maxwell explain the trading strategy at Bill's Steak house, in

Iowa, these high school graduates viewed the opening documents as the same type of documents

one would sign to open a credit card for example by just signing on the dotted line.

250.   In addition, some of the documents were unwittingly signed in blank by plaintiffs

to be filled in later.

251.   Perry Comeau in Iowa also had the Plaintiffs sign documents for their IRA monies

for Millenium Trust.

252.   Garlon Maxwell and Amber Maxwell, upon information and

belief: were unauthorized to trade Future's Contracts and this fact became known through the

prior FCM Interactive Brokers, Inc.

253.   Interactive Brokers, Inc. knew in 2005 that the commodities

laws required all CTA's or Commodities Trading Advisors to be registered with the National

Futures Association to even be allowed to trade on behalf of customers. Thus, upon information

and belief, when Interactive learned that neither Garlon Amber nor Perry Comeau were licensed

Commodities Trading Advisors, Interactive asked them to terminate their accounts with Interactive Brokers immediately.

254. In addition, the Commodities Exchange Act also imposes strict liability on any principal for the acts of their agents. 7 U.S.C. § 2(a)(l)(B). Thus, if the CTA's were unregistered, Interactive Brokers could be held liable for any damages on a strict vicarious liability basis, since the CTAs have been considered agents of the FCMs. Again, Interactive did not want to risk that problem, upon information and belief.

255. The exception to registration in Iowa did not apply--where an unregistered advisorcould handle up to 5 accounts, because the Maxwells were handling more than that limit. The Maxwells were asked to leave Interactive Brokers, upon information and belief.

256. It does not appear that the Maxwells attempted to even register as CTAs in 2005, and they thought they could fall under the exception to registration which states that if one is just trading for friends or close family members (15 persons or less), and not holding herself out to the public as a trader, they would be exempt from registering.

257. However, whether or not an exemption from registration existed, and the overwhelming evidence rejected by the NFA arbitrators showed that registration was required because Garlon Maxwell and Amber Maxwell were originally strangers to these Iowans not friends at all-even including Perry Comeau who just met Maxwell at a seminar where Mr. Maxwell held himself out to Mr. Comeau as an investment professional upon information and belief.

258. Garlon Maxwell, Amber Maxwell and Perry Comeau were being investigated By the Iowa Department of insurance for infractions relating to their purported status as Investment advisors in the State of Iowa. Fines were levied against each of them with cease and desist orders in 2007.

259.   Notwithstanding these fines and cease and desist order, not one of these defendants ceased nor desisted, but they continued to operate in the State of Iowa and eventually dissipate the Plaintiffs' accounts to zero.

260.   These three defendants were ideal candidates for Wasendorf, Sn.'s scheme.

261.   For example, when Peregrine Financial Group, Inc. ("PFG") requested that Garlon Maxwell fill out forms for their review, Maxwell did not fill in the box where it was asked if he ever had gone Bankrupt which he had. But, PFG was not concerned with doing honest due diligence, because Wasendorf wanted co-conspirators who would agree to hide customer stolen monies.

262.   Thus, Garlon and Amber Maxwell had perfect track records to meet Wasendorf's needs, because Wasendorf and PFG could not actually do the advising of clients themselves, they needed the help of these CTAs to purposefully end customer accounts and needed the assistance of traders and brokers.

263   Amber Maxwell was also never registered as a CTA during any time when these customers' accounts were being traded by her or by her assistance to her husband Garlon Maxwell.

264.   Garlon Maxwell was never registered in any capacity with the NFA during the life of these customer accounts either.

265.   Perry Comeau, the Iowa agent of PFG and the Maxwells was also not registered with the NFA during the life of these customer accounts, upon information and belief.

266.   The Maxwells intended to and did receive large commissions on these Customer accounts, as did, PFG, Millenium and the CME. Perry Comeau would receive reduction in his own trading fees, as his commission.

**Crossland and Millenium Trust Company-March, 2007 to August 2008**

267.   In March, 2007, transfer documents were signed to initiate transfers

From Interactive Brokers to Crosslands, Inc. Plaintiffs' accounts remained at Crosslands for just

7 months until they eventually ended up at PFG.

268.   However, now Perry Comeau, Amber Maxwell and Garlon Maxwell divvied up the

customers so that it would look like each advisor had less than 15 accounts, and would fit into

the Federal exemption, although Garlon and Amber still held themselves out to these customers

as members of the public which should have disqualified them for the exemption.

269.   Because many if not most of the Plaintiffs' assets were in Traditional

l IRA accounts, Millenium an IRA trustee was used to help transfer these accounts to PFG.

Millenium Trust Co. Inc. became the IRA Trustee for the groupe.

270.   Amber Maxwell was the one to trade the Shefferts' accounts even though she had

just been fined $15,000.00 by the Iowa Department ofInsurance and was not registered with the

NFA when these accounts were opened.

271.   Shortly after Millenium got involved as the IRA trustee for

the group, Garlon Maxwell and Amber Maxwell met Steven Brewer of Brewer Futures Group

who perhaps introduced the Maxwells to Russell Wasendorf. Sn.

272.   Imprudent trading continued even in these IRA accounts until

the week of October 2, 2008 through October 8, 2008 where all accounts were wiped out,

sending these investors home penniless and having to still pay their bills.

273.   Shortly after opening accounts at Crossland in April, 2007, the

Maxwells told the group that they wanted to transfer all of the accounts to PFG using Brewer to

introduce their accounts. The Maxwells and Comeau told the group they could save on fees by

leaving Crossland. They had only been at Crossland for a few months before this move was

initiated by the Maxwells.

274. However, because the Maxwells were not registered as Introducing Brokers, theycould not even trade in the accounts or bring the accounts to PFG. So, instead, Steven Brewer of Brewer Futures Group agreed to serve as Introducing Broker on behalf of the Maxwells and gave the Maxwells a platform on which they could execute trades at Peregrine, the FCM.

275. Steven Brewer entered into an agreement with Russell Wasendorf Jr. this time agreeing that if there were any margin calls on any of the customer accounts, Brewer would cover these deficiencies for the customers. He then would contact the customers to satisfy these margin deficiencies.

276. More customer agreements and transfer documents were signed and the accounts were transferred in August, 2007 to PFG through the Introducing Broker Brewer, to be traded by Garlon Maxwell with the assistance of Amber Maxwell and Perry Comeau of Iowa and in Iowa.

277. These accounts remained opened until October 8, 2008 when all the customer account values were wiped out.

278. During this time, the accounts were fictitiously traded using options, out-of- the money, naked puts and call. Such a strategy was extremely risky and lost 95% of the time. These types of investments are extremely unsuitable for conservative retirees, such as Plaintiffs herein. CME and CME Group allowed this type of trading on its exchanges. Untoward Conduct During the Week of October 2, 2008 through October 8, 2008 consisting of Violations of the CME Margin Rules 930 D, E and K, overwhelmingly demonstrate a Conspiracy.

279. CME rules 930 D, E, and K require all under margined accounts to stop trading except for liquidation only trades. Put otherwise, once a customer falls into a margin deficiency, he or she is not allowed to initiate new positions, but can only close out positions to decrease his

margin requirements and/or wire money into his or her account to preserve present positions.

280.   CME is supposed to monitor all open positions on a daily basis and prevent under-margined accounts from remaining open. But not in this case, because the CME's own rules allowed for an exception to its CME rulebook as part of the CME's Omnibus Sub-Account rules. See CME Rule Book 9301.

281.   Beside the CME, all FCMs such as Peregrine also have adopted this industry standard in their Customer Agreements also for the non-altruistic reason of also preserving the FCM's assets because in the case of a Margin Deficiency the FCMs and Clearing Members, and all members are strictly liable to the CME for such shortfalls.

282.   CME rules are normally strictly enforced. However, these rules also have a key benefit for customers who will have an opportunity to close his or her account rather than risk sending in more money. So, the rule is an industry standard and all parties can gain a benefit from this Rule.

283.   In this particular case, there were two egregious courses of conduct that not only violated the CME Group margin rules but good faith where plaintiffs fell into a Margin Deficit leading to a Margin Call beginning on October 2, 2008, a Wednesday. On that day for example a Margin Call was issued on Sherri Sheffert's IRA Account in the amount of approximately $52,650.00.

284.   Under normal circumstances, and acting in good faith, all trading would have stopped immediately on October 2, 2008, and the Shefferts would have been called by telephone immediately to satisfy this Margin Call.

285.   All defendants had the Sheffert's phone numbers. Because the Shefferts did not have any extra cash to satisfy this Margin call, they would have instructed their brokers to stop trading in their accounts. and they would have preserved their remaining Capital.

286.  Plaintiffs main concern was always preservation of Capital.

287.  Because they believed only 10% of their capital was at risk, they would have lost at most 10% of their life-savings not 100%.

288.  Had trading stopped in this case, the Shefferts' balance at the close of business on October 2, 2008 was $281,762.46, their losses would have been limited to approximately $52,650.00.

289.  Not only was no phone call ever made to the Shefferts by any of defendants, but a letter was sent to their address in Mission, Texas, although they were right there in Oelwein, Iowa on October 2, 2008.

290.  The mailing of a letter certainly was intended to violate CME Rule 930K, since it certainly takes more than one hour for a letter to arrive through the U.S. postal service. How could defendants comply with this CME rule 930K which only allows customers one hour to satisfy a margin call if they are mailing out Margin Call notices instead of calling the customers as is the well-established custom in the Industry?

291.  In fact, PFG's own Compliance and Procedure Manual clearly states that Margin calls should be made to the customer by the AP, Associated Persons. It states in Section 16.6 that each AP should call the customer promptly over the telephone and advise them of the margin call. The AP shall also find out how the customer intends to deal with the Margin Call.

292.  Because the defendants normally would be liable for any deficiencies in the customer accounts, defendants would be incentivized to pick up the phone and follow the rules of law and afford the customers one hour to either make arrangements to satisfy a margin call or to close their customer accounts.

293.  However, where the intent is to destroy these customer accounts, then no such calls would be f01ihcoming as in this case herein.

294.   Although this type of misconduct might be attributable to negligence on one or perhaps two occasions, there were approximately 35 customers accounts similarly situated during this one week. Such an oversight is unfathomable based on negligence, but likely based on fraud and bad faith conduct.

295.   More evidence of this Conspiracy is demonstrated by conduct the following day on October 3, 2008, a Thursday. Despite being on a Margin Call from the preceding day, on this day, again neither the Schefferts nor any of the investor group received any type of phone call as is mandatory in these types of situations.

296.   More evidence of this intentional conduct to wipe out Plaintiffs' accounts Is demonstrated on October 2, 2008, October 3, 2008, and October 6, 2008. New positions were initiated in the Schefferts' accounts in violation of CME Rule 930D.

297.   One wonders how a broker could continue to initiate new positions where there is a short fall in the customer account?   However, on October 2, 2008, 30 put options contract were written on behalf of the Schefferts on the E-mini S&P 500 index with a strike price of $1000.00.

298.   On October 3, 2008, a Friday, the Schefferts were still in a Margin Call, and again none of the defendants called the Schefferts. On this day, their margin deficiency went from approximately $50,000.00 from the day before to approximately $160,000.00. Notwithstanding this continued Margin deficiency and with a Margin Call outstanding, the defendants, PFG and the CTAs continued to write naked put options, initiating another 30 new positions on October 3, 2008.  The initiation of these new positions was another violation of CME rules, 930D in particular, and is more evidence of intentional conduct to create losses in these unwitting customers' accounts.

299.   That weekend, October 4, 2008 and October 5, 2008, the Schefferts still had no idea that their life savings were being wiped out. Apparently, someone at PFG was working that

Sunday, but did not call the Shefferts who were home. Instead, on Sunday, October 5, 2008, Peregrine sent another letter this time to Millenium, a co-conspirator who did nothing to satisfy this margin deficiency. It appears that this letter was a just a cover up showing that some effort was made. Normally letter head has the address on the top. The date, not the day of the week is also listed on the letterhead. On this letter of October 5, 2008, nobody signed this letter although it was produced by Peregrine to the Shefferts at some point.

300.   Again, the mailing of a letter on Sunday October 5, 2008 to Millenium Trust did nothing to apprise the Shefferts of the terrible and avoidable situation they were in.

301.   On Monday, October 7, 2008, the Shefferts still ignorant that their life as they knew it was over,  incurred  more losses in their accounts. By October 8, 2008, their remaining balance was approximately $13,000, a loss of 96% of their portfolio in one week

302.   Clearly because of the blatent violation of margin rules, a reasonable inference can and should be drawn that these trades were fictitious and meant to elimate these customers from PFG, since Wasendorf  had already pocketed  Plaintiffs' money.
Because PFG failed to use the 70%-30%  Rule to invest the IRA Fund, this Conduct was intentional.

303.   Because an accepted norm among commodity firms is to only allow 30% to 70% to be invested in commodities futures contracts that exist in an IRA, the fact that plaintiffs were allowed to invest much more than that shows intentional conduct to purposefully terminate plaintiffs' account. In other words, in a portfolio of $100,000.00, only $21,000.00 should only be used as Margin to initiate positions. Again this conservative rule is to protect the FCMs and/or CME and CMEG .   Because investors of lRA proceeds are not liable for any deficiencies under the law, the FCMs would be responsible for these amounts.

304.   In addition, because a margin call may require the addition of fresh cash, and IRA

rules only allow approximately $5000.00 per calendar year in 2008 to be contributed to a traditional IRA, any margin call over $5000.00 would cause a customers' account to be immediately closed under CME rule 930K.

305.   Thus, the complete disregard for such safeguards for the Defendants themselves, supports a strong inference that they were not concerned with protecting their own potential losses, but were very interested in getting rid of these customers' accounts.

**Other instances of Fraudulent Inducement Based on**
**Naked Puts and Calls bound to lose 95% of the Time**

306.   In addition to the Oelwein Plaintiffs, this Scheme also effected other PFG customers as well. Although PFG customers who had valid accounts as of 2012 were apparently included in a previous Chicago class action, the Plaintiffs who were not included in the Class can now also recover in this case.

307.  Other examples of the same type of conduct that befell the Oelwein Plaintiffs

is clearly demonstrated by other Introducing Brokers who introduced accounts to PFG during the relevant time period including but not limited to Clash Financial, LLC, Oxford Trading Group, LLC, California Capital Trading Group, LLC; Patriot Financial Markets, LLC, Empire and Financial LLC.

308.   In these other cases of other Introducing Brokers trading on behalf of Customers through PFG or directing their accounts, evidence was adduced that proved that these other Introducing Brokers also put their customers in naked puts and calls readilydestroying each customer's accounts.

309.   One example of this persistent pattern of Racketeering activity to fraudulently induce customers to enter losing investments occurred in October, 2009 by an introducing Broker who traded through PFG, Oxford Trading Group, NFA ID #414318. Here an AP of

Oxford Trading, Eric Clary fraudulently induced a customer named Allen Dollarhide to enter into naked puts and calls resulting in severe losses to his customer account.

310.    Clary and others at Oxford Trading Group made fraudulent statements to Allen Dollerhide such as that Clary "had made many clients large profits and that all of his accounts on average made profits of 140%." See NFA Case No. 10-BCC-020 at 9(August 10, 2009.) In addition, Clary never explained the risks of investing in these types of options.

311.   After Mr. Dollarhide made an initial investment in October, 2009, Clary insisted that Mr. Dollarhide needed to continue to invest so as not to miss highly profitable opporhmities.

312.    Mr. Dollarhide believing Clary's prevarications that he had to move quickly to take advantage of the opportunities presented to him, Clary recommended buying buy options on wheat based on news reports that there was an infestation of locusts in South Africa as support for his recommendation.

313.    Mr. Dollarhide made three deposits into his account totaling $53,000.00 between October 30th and November 10, 2009. By the end of February, 2010, Mr. Dollarhide had lost more than $41,500.00-nearly $27,000.00 was attributable to commissions and fees. This insane allocation to commissions and fees was actually an attempt to hide the Ponzi Scheme. All of Mr. Dollarhide's investments consisted of bull call spreads (naked options) which lose 95% of the time.

314    Another example of this pattern of Racketeering activity occurred with respect to another PFG introducing broker, California Capital Trading Group, ("CCTG") NFA ID #386834 where one of its Associated Persons ("APs") fraudulently induced a member of the investing public Peter Tovenati to make extremely risky investments in naked derivative options that lose 95% of the time.

315.   Mr. Tovenati, like the Oelwein Plaintiffs herein, had no previous

experience investing. He opened an account in March, 2009 with an AP ("Associated Person"), Mr. Morales, with California Capital Trading Group. Mr. Tovenati, like the Shefferts, and Behrens, relied on his Investment Advisor's advice 100% to make investment decisions. Based on the bald misrepresentations of risk, Mr. Morales induced Mr. Tovenati to make six deposits into his trading account over fourteen months totaling $68,6333.00. After Mr. Morales perpetuated this Fraud, Mr. Tovenati only had $375.00 left in his customer account which was closed in June of 2010.

316.   Another example of how customer accounts' were purposefully destroyed included PFG's disregard for the customer's instructions to stop trading in her account; instead PFG allowed the accounts to be traded in an unauthorized fashion eventually destroying the equity in customers account as in one case where a customer placed $500,000.00 in an PFG account only to be used for savings and instructed PFG to only purchase U.S. treasury bonds.  Instead, PFG linked this savings account to another Futures trading account and eventually without client authorization debited the entire $500,000.00 despite the testimony of the complainant that she had not authorized trading in this savings account. See Chenli Chu v. James Francis Kelly and Peregrine Financial Group, Inc. CFTC Docket No.: 07-R029 (Oct. 7, 2009.)

317.   Plaintiff, David Sheffert, also specifically instructed PFG, Brewer and Garlon Maxwell to stop trading in his and his wife's accounts around his wife's birthday in the Spring of 2008. PFG and its co-conspirators completely disregarded this instruction, and continued to trade out the accounts to a zero balance. Clearly, the CTAs could not abide by this instruction, and violated 17 CPR 166.2 by refusing to stop trading. However, because there was presumptively no money in the Shefferts' accounts anyway, the CTAs had to continue to wipe out these accounts and perpetuate this Scheme.

318.   When the Oelwein customer's accounts were destroyed in October,, 2008, Mr.

Sheffert actually thought his funds were safe based on his prior instructions to stop trading in the Spring of 2008. However, PFG and the co-defendants totally disregarded these instructions and continued to dessicate Mr. Sheffert's account.

319.   In another example of misconduct to purposefully destroy customer accounts and pocket customer monies, claims of using a master board were alleged, by at least one investor, Mr. Richard Chaput who claimed that without his knowledge or authorization, Brewer Futures Group through PFG put an unauthorized contract in Mr. Chaput's customer account that Mr. Chaput eventually had to offset at a loss. When Mr. Chaput complained that this contract just appeared in his account was an error, and he never entered into this position, nothing was ever done about it. Mr. Chaput claimed that there was a Master Board used by PFG to allocate gains and losses among customer accounts. See Claim of Richard Chaput, Filed October 29, 2012 In Re Peregrine financial Group, Inc.

320.   Therefore, through a variety of means and methods, PFG with its Introducing Brokers,  CTAs and others meticulously destroyed customer accounts during the relevant time period and never even actually traded these customer accounts over any Exchanges.

Role of JP Morgan Chase, N.A. and US Bank, NA in this Conspiracy

321.  This Ponzi Scheme including the monies in the total amount of $215,000,000.00 over a twenty year time frame from 1992 through 2012 from these customer accounts at JP Morgan Chase NA and U.S. Bank, and this Scheme could not have occurred without the Banks' full cooperation and breaches of their legal duties including breaches of fiduciary duty and Fraud by Omission and violation of? USC 6(d)(b)2 and 17 CFR l.20(a).

322.   The motivation for the behavior of all defendants was substantial fees derived by ostensibly legitimate courses of dealing such as Exchange fees, NFA fees, Incentive Fees and other commissions which never would have been earned absent participation in this Fraud which

allowed business to be given to the various defendants. Each defendant acted to preserve its business relationship to get more business in the future whether legitimate or not.

323.    Because these customer segregated accounts are special accounts, the law requires these banks to afford each customer and Plaintiffs herein a special duty of care to make sure these accounts are safely held as in the equivalent of a vault or safety deposit box and not given to Mr. Wasendorf, Sn. to live the life of Riley and then to distribute these customer segregated monies to the banks and CME and NFA as "fees."

324.    JPMorgan Chase, NA ("JPMC" hereinafter) just like US Bank, NA, also held Sub Class A and B. customer monies in a customer segregated account ending in 5265 during the relevant time period, and intentionally and knowingly transferred millions of dollars in PFG customer money including the Oelwine Class Plaintiffs to U.S. Bank's 1845 account for the sole conversion and/or use by Wasendorf, Sn. to personally take the monies including plaintiffs during the relevant time period.

325.   Later, Wasendorf, Sn. would distribute the stolen customer segregated proceeds to co-defendants by way of fees which were made to look legitimate but were not at all legitimate and constitute money laundering.

326.    For example, after the transfer from the JP Morgan Chase 5265 Segregated Customer Account into the account that Wasendorf used as unsegregated, non-customer account, the 1845 account at U.S. Bank, (although 1845 was a segregated account in reality and should have been treated as such.); Wasendorf Sn. was easily able to pocket customer moneys and skirt the law. Notably 7 U.S.C. §6(d)(b) and 17 C.F.R. § 1.20 were disregarded, there provisions impose a special duty on banks to ensure that customer segregated monies do not get commingled with house money.

327.    After the diversion of funds, Wasendorf, Sn., who in turn diverted these

funds to his own unauthorized uses such as buying homes, a jet, restaurants and office buildings and living a lavish lifestyle, and funding his numerous other companies and the construction of an office building in Iowa.

328.  U.S. Bank held  30 accounts for Wasendorf and related companies to PFG during the relevant time period including business accounts, (house accounts or proprietary accounts), personal accounts and segregated customer accounts and Wasendorf, Sn. was considered a preferred and favored customer.

329.  U.S. Bank allowed Wasendorf Sn. to use this 1845 Segregated Customer account as pledged collateral for a personal loan not related to customers.

330.  U.S. Bank also wrongfully took from the 1845 accounts itself when it debited approximately $30,000.00 in bank processing fees from the 1845 account that were not a result of processing customer related business, but was based on non-customer transactions.

331.  U.S. Bank routinely accepted deposits of customers segregated funds into the 1845 account and designated for deposit to a "customer segregated account.

332.  However, when transfers were made out of the 1845 customer segregated account, the internal computers at US Bank removed the "customer segregated account" information and just called it a Peregrine Account for outgoing transfers.

333.  By removing the words "segregated account," U.S. Bank intentionally tried to hide what it was doing by using the 1845 monies for non-customer purposes and by transferring customer monies to non-customer accounts such as Wasendorf Constructions Accounts, Connie Wasendorf s personal account and/or Wasendorf and Associate's accounts.

334.  JPMC also routinely transferred monies from its customer segregated account held for PFG (the 5265 account) where Plaintiffs initially deposited their life-savings. These wire transfers were from the 5262 JPMC segregated account to the 1845 U.S. Bank customer

segregated account and included:

a.      A $25,000,000.00 transfer on November 1, 2005

b.      An $8,000.000.00 transfer on December 13, 2005

c.      Transfers of $5,000,000.00 and $10,000,000.00. in January and February 2007.

d.      A $5,000,000.00 transfer in January, 2008

e.      A $7,000.000.00 transfer in January, 2009

335.   These round lot numbers clearly show that these JPMC transfers were not based on customer sub-accounts which had odd numbers, but represented transfers in bulk for non-customer purposes.

336.   JPMC during the relevant time period was also engaged in a pattern  of activity with respect to its segregated customer accounts.  With respect to Lehman Brothers, JPMC was also using customer segregated accounts for non-customer uses like colateralizing loans to Lehman Brothers, Inc. JPMC eventually was caught and paid a $20 million dollar fine for the inappropriately using of customer segregated accounts for its own benefit. See JP Morgan Consent Order, CFTC No. 12-17 (April 4, 2012) .

337.   From June 2008 through July 2012, US Bank held withdrawals of  PFG  accounts for non-customer purposes in violation of fidcuiary standards..

338 .Of this $161,971,259.11 amount  $108,500,000. was withdrawn via 20 transfers m a coordinated fashion from the Customer segregated Account at JPMC number 5265  members segregated monies.

339.   The Banks knew that each customer had a sub account number and name after each sub accout, including the words "IRA" for IRA accounts showing that these accoun belonged to members of the public. Thus, each time a transfer was made out of a customer segregated account over the wires, wire fraud was committed; and the Banks knew that transferring of

actual customer monies that were supposed to be kept segregated for customer use only was a violation under 7 U.S.C. § 4(d)(b) and 17 CPR§ 1.20.

340. From June 2008 through July 2012, Wasendorf withdrew a net amount of $35,665,995.40 from the 1845 account for non-customer purposes, including Plaintiffs' money, upon information and belief.

341. Although PFG could co-mingle house money in a customer segregated account to shore up the account for example, if a Margin Deficiency existed pursuant to 17 C.F.R.1.23, PFG could only withdraw its house money from the 1845 and 5265 accounts. The evidence shows that only 6% of the 1845 account derived from house money and 94% of the funds were customer monies that could not be used or transferred for non customer purposes.

342. Wasendorf Sn. continually instructed a loyal employee at US Bank, Hope Timmerman to transfer money out of the 1845 customer account into his other business and personal accounts and freely made transfers for his own use and the use of his business such as:

a. On June 13, 2008 Wasendorf telephoned Timmerman and requested that U.S. Bank transfer $400,000.00 from the 1845 Account into a US Bank account for a Wasendorf business account called "Wasendorf & Associates." That request was processed and the transfer was made.

b. On December 31, 2010, Wasendorf, Sn. requested and US Bank transfer $2,469,692 from the 1845 Account to Connie Wasendorfs US Bank personal savings account to fund the settlement of his divorce.

c. On June 27, 2008 Wasendorf made a counter withdrawal for a cashier's check made out to one of his vendors related to Wasendorf Construction, Anfinson & Luce Trust in the amount of $563,956.02.

d. On December 1, 2008, Wasendorf, Sn. only had a balance

of $7,109.83 in the Wasendorf Construction account at US Bank ending in 0329. To pay an

obligation, Wasendorf, Sn.just transferred customer monies from the segregated customer

account 1845 in the amount of70,000.00. On the same date, he then wrote a check in the amount

of $371,823.96. No other deposits were made to the business account ending #0329 during that

time period.

343. US Bank through their employee Hope Timmerman aided and abetted

Wasendorf Sn. and allowed US Bank not only Wasendorf to gain impermissible profits from the

#1845 account which they knew Wasendorf would eventually dissipate in phony customer

futures and options trading.

344. Hope Timmerman would herself on multiple occasions fill out the withdrawal

slips and sign the signature line as "known customer." This conduct provided a cover up for the

fact that Wasendorf, Sn. was making the withdrawal.

345. This courtesy was returned, when Wasendorf, Sn. took the liberty of signing Hope

Timmerman's name on the income verification forms sent to the NFA who audited PFG. The

NFA was PFG's DSRO (Designated Self-Regulatory Organization) during the relevant time

period. **Unlawful Loans Approved By US Bank creates liability for US Bank**

346. US Bank through its employee Hope Timmerman and other bank personnel

wrongfully approved two loans made to Wasendorf, Sn. during the relevant time period. First,

Timmerman approved a construction loan made to Wasendorf Constrnction Company on

September 4, 2008 in the amount of $6.4 million dollars to build an office building for

Peregrine, as well as another separate loan in the amount of $3 million dollars.

347. However, PFG had office space, and therefore in hindsight the obvious reason for

this "construction loan" was to generate illegal loan origination fees and interest for US Bank in

consideration of all the unlawful transfers US Bank made for Wasendorf, Sn.

348. Upon information and belief, these two improper loans generated $290,000.00 in interest for US Bank, and therefore such interest was improperly gained.

349. In fact, neither Wasendorf Construction nor Wasendorf, Sn. had the financials to justify extending these loans. In evaluating whether there was sufficient collateral for a loan, Timmerman had access to the Wasendorfs' personal tax returns, financial statements, Peregrine's financial statements, Wasendorf Construction's financial statements, CFTC form 1-FRS.

350. After reviewing this information, Timmennan reported these numbers in a Standard Credit Display (SCD), and US Bank approved these loans.

351. In September, 2008, at the time when the loans were executed, the Customer Segregated #1845 account had approximately $33 million dollars in it; whereas the Peregrine house account only had less than $250,00.00. Thus, the #1845 account clearly was used to collateralize the Construction Loan and other personal loans in the combined amount of $9,400,000.00. This use of the Customer funds was in contravention of 7 USC 6(d)(b), since the segregated customer funds could not be used for non-customer purposes like collateralizing a loan to build an office building for PFG.

352. In 2011, the #1845 account again had the most assets, and the 2011 guarantee also used the balances in the #1845 segregated customer account in the SCD which is unlawful. For example, as of August, 2011, there was $5 million to $7.1 million in the #1845 customer segregated account and only $680,000.00 in Peregrine's House Account which is a business account. Therefore, a loan of $9,400,000.00 could not have been made without consideration of the customer segregated accounts.

353. On September 9, 2008, a Guarantee was executed in favor of US Bank in consideration of these loans and allowing US Bank to use the #1845 customer segregated monies

as collateral for the loan which would have given US Bank a right to set off the loan upon a default from the customer segregated #1845 account. These guarantees were executed in 2008 and restated in 2011 and stated as follows: "Collateral; Setoff. [Peregrine] grants to [US Bank] a security interest in all property in which [Peregrine] has an ownership interest which now or in the future in possession of (US Bank) to secure payment under this Guarantee. (Peregrine) hereby authorizes [US Bank] to secure payment under this Guarantee. [Peregrine] hereby authorizes [US Bank], without further notice to anyone, to charge any account of [Peregrine] for the amount of any and all obligations due under this Guaranty, and grants (US Bank] a contractual right to set off (without notice or demand) amounts due hereunder against all depository account balances, case and other properly now or hereafter in the possession of [US Bank] and the right to refuse to allow withdrawals from any account. (collectively Setoff)" 2008 Guaranty (emphasis added.)

353(a).   In 2011, upon information and belief, the $3,000,000.00 personal loan was improperly  repaid to US Bank indirectly out of the #1845 Customer Segregated Account, when for example Wasendorf transferred $3,005,150. from the #1845 account on February 18, 2010 to the Wasendorf Construction account and then eventually retired the second loan from this transfer from the #1845 account to the Wasendorf Construction Account.

354.   Because US Bank knew that transfers out of customer segregated accounts were making their way into the pockets of US Bank such as in the form of a repayment of a loan, US Bank consciously avoided these facts, and therefore allowed Plaintiffs to sustain a total loss of their customer segregated monies held in thee accounts.

355.   Because US Bank knew that the funds had been transferred from the #1845 account to house account, it was clear to US Bank that customer monies were being wrongfully used for unlawful purposes such as repayment of a construction loan.

**Role of Wasendorf Sn and PFG in the Theft of $215 Million Dollars During the Relevant Time Frame**

356.   Wasendorf established PFG in 1990. During the relevant time period, PFG maintained its offices in Chicago, Illinois and in Cedar Falls, Iowa.  PFG is not named as a defendant because the company has filed for bankruptcy and naming the company would violate the automatic stay. 11 U.S.C. § 362.  P F G is now defunct.

357.   From its inception until its bankruptcy, PFG was a registered futures commission merchant or FCM.   As a CCM it could solicit or accept orders to buy or sell futures contracts or options on futures contracts, and could accept money or other assets from customers to support those orders. FCMs receive money, securities, and other property from their customers to margin, guarantee, or secure the customers' futures and options trades.

358.   The Commodity Exchange Act (CEA) and CFTC regulations require FCMs to maintain segregated and secure accounts for their customers' funds. 17 C.F.R. § 1 .20(a).

359.   Customer funds may not be commingled with the firm's operational funds and may not be used to margin or guarantee the trades or contracts, or to secure or extend the credit of any other person or entity. See id.; see also 7 U.S.C. § 6d(a)(2).

360.  FCMs must file monthly financial reports with the CFTC known as" 1-FR" reports. These reports require FCMs to provide financial statements that show, among other things, the amount of customer funds the FCM has in segregated bank accounts.

361.  The financial statements filed with the 1-FR at the end of the year must be audited.. Since 2001, PFG always used the same accountant to perform its audits- The VerajaSnellingCompany-a one-person firm run out of the owner's home in Glendale Heights, Illinois.

**PFG's Misuse of Customer Funds from 1992 to 2012 and Concealment  of The Fraud.**

362.   Upon information and belief, to conceal and continue its misuse of customer funds, Wasendorf established a post office box in Cedar Falls to intercept mail directed to U.S. Bank, including mail sent by the NFA and PFG's auditor. By forging bank statements and other documents that reported the balance in its U.S. Bank accounts, PFG was able to represent to the NFA and its auditor that it maintained a customer segregated account that eventually contained over two hundred million dollars, when in fact the balance was typically under $10 million. PFG was able to continue representing itself as operating in compliance with governing regulations to its regulators, its customers, and the general public while it pilfered its customers' money.

**The Regulatory Framework Applicable to the Banks**

363.   Under relevant banking regulations, a bank is required to collect and maintain certain information concerning their customers. The bank must maintain procedures that allowed it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. § 1020.220(a)(l), (2). To accomplish this goal, the bank is required to collect information about the holder of each account. 31 C.F.R. § 1020.220(a)(2). When an account is opened by an entity rather than an individual, the bank must obtain information about the individuals with authority or control over the account. 31 C.F.R. § 73 1020.220(a)(2)(ii)C.

364.   Pursuant to federal regulations, the bank must develop, administer, and maintain a program that ensures and monitors the bank's compliance with the Bank Secrecy Act (BSA). 12 C.F.R. § 21.21. The plan must be approved by the board of directors and noted in the board meeting minutes.  The program must include a system of internal controls designed to ensure ongoing compliance, independent testing of the bank's compliance, daily coordination and monitoring of compliance by a designated person, and training of appropriate personnel.

365. A bank must also develop a Customer Due Diligence (COD) program that assists in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and which provides the bank with a way to identify unusual or suspicious transactions for each customer. The COD program allows the bank to maintain an awareness of the unique financial details of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

366. The bank must ensure compliance as a condition of employment and in corporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations for its employees. The bank must also train all operational personnel whose duties may require knowledge of the BSA, including tellers and wire room personnel, on the BSA, including identification of various "red flags" discussed below.

367. The bank must identify a BSA Compliance Officer who is a senior bank official and who is responsible for coordinating and monitoring complete compliance with the BSA. FDIC Rules & Regulations § 326.8. The BSA Compliance Officer is required to designate an individual at each office or branch to monitor the bank's day-to-day compliance with the BSA.

368. Because the Banks provided services to PFG, a high-risk account/customer, the Banks were required to enhance their procedures, including applying a risk rating to PFG. To determine PFG's risk rating, the Banks were required to obtain customer information to develop a "customer transaction profile" that incorporated an understanding of normal and expected activity for PFG's business operations.

369. Since March 2002, the CFTC has posted on its website a monthly report providing information about each registered FCM, including: (i) the FCM's adjusted net capital; (ii) the FCM's net capital requirement; (iii) the FCM's excess net capital; (iv) the amount of customer funds required to be segregated; and (v) the amount of funds required to be held in a

foreign futures and foreign options secured account.

370. The Banks knew that FCMs are highly regulated by the CFTC and NFA, and that they are required to maintain customer funds in segregated and secured accounts and are separated from the firm's funds. See 17 C.F.R..§ 1.20(a). The customer funds are required to be segregated, held for the exclusive benefit of the customer, and otherwise protected from misappropriation or unauthorized use. See id.; see also 7 U.S.C. § 6d(a)(2).. These requirements ensure that customer funds are protected, in the event that an FCM attempts to divert or otherwise mishandle customer funds, or declares bankruptcy. Both events have occurred in this case 344. The Banks knew that when customer funds are deposited in a bank, they are to be deposited under an account name that clearly shows they are customer funds, segregated as required by the CEA. See 17 C.F.R. § 1.20. The Banks knew that any account held out as or named a customer segregated account would reasonably lead others to conclude the account maintained customer funds that were being segregated and protected consistent with the CEA rules and regulations.

371. The Banks also knew that customer funds maintained in a segregated account could not lawfully be transferred to a personal account of the Wasendorfs or a "house" account maintained by PFG.

372. The Banks knew that PFG was a fiduciary to its customers with respect to the money they entrusted to PFG.

**Additional Facts Pled with Particularity Regarding U.S. Bank Leading to the Loss of Customer Funds.**

373. PFG's had two Primary U.S. Bank Accounts including the 1845 Customer Segregated Account.

374. PFG opened two of its accounts with Firstar, U.S. Bank's predecessor,

between 1992 and 1994. The first of these accounts was established as a customer segregated funds account. It had an account number ending with the digits #1845 and is referred to as the "1845 Account." The second account was designated by both PFG and Firstar as PFG's "house" account. Firstar documents expressly labeled the account as PFG's house account, as reflected by an April 2002 letter addressed to PFG's "house account." A house account, sometimes referred to as a "proprietary account," is an account maintained by an FCM for itself and for its own funds and those of its affiliates. An FCM typically designates an account as a "house" account, because it has other accounts at the same banking institution that hold customer segregated funds, which cannot be intermingled with the house account funds.

375.    The #1845 Account was designated by both PFG and Finstar as a customer segregated funds account. The designation appeared on official Finstar documents, including a letter sent by Finstar to PFG acknowledging that the account held customer segregated funds. Finstar, the predecessor in interest to US Bank, provided Peregrine with an acknowledgment letter signed by then Vice-President of Finstar, Clifford Mortenson, who stated:

> "You have opened [the 1845 Account], as well as a safekeeping account, with both designated "Peregrine Financial Group Inc. Custom Segregated Account." You have advised us that the funds deposited in the [1845 Account] constitute monies belonging or accruing to your futures and options customers which you are required to segregate :from your own funds under the Commodity Exchange Act... You have further advised that the securities and other property deposited in the safekeeping account above described constitute investments of funds of your futures and options customers and securities deposited with you by those futures and options customers to margin, guarantee or secure the trades or contracts of you futures and options customers that all such securities and other property are to be segregated and kept apart from your own securities and property. We hereby acknowledge your notice that monies, securities and other property deposited in the accounts above described are those of your futures and options customers and are being held in accordance with the provisions of the Commodity Exchange Act... We further acknowledge that the monies securities and property contained in such accounts shall not be subject to any right of offset or lien in our favor for or on account of any indebtedness, obligations or liability owing by you to us." See CFTC v. US Bank, NA., 13-cv-2041, Summary Judgment Order Doc.#112, pp. 7-8 (11/19/14 N.D. Iowa)"

376.  In December 1994, PFG entered into a "Master Repurchase Agreement (Public

Securities Association Prototype)" with Finstar. The agreement governed the investment of the customer segregated funds held in the 1845 Account and expressly recognized that the 1845 Account was a customer segregated account. Finstar engaged in repurchase transactions with PFG using the customer segregated funds in the #1845 Account for years after the execution of the 1994 agreement. Sometime around April 2002, PFG's accounts with Finstar began to be referred to as U.S. Bank accounts. The #1845 Account maintained the same account number through and following the transition.

377. PFG's records contain a July 5, 2001, letter from U.S. Bank to PFG stating that the #1845 Account was titled "Peregrine Financial Group, Inc., Customer Segregated Account." The letter is signed "Hope Timmerman."

378. While the #1845 Account was a Finstar account, and continuing into 2004 after the account became a U.S. Bank account, PFG wrote checks out of the #1845 Account using checks that identified the #1845 Account as a customer segregated account. Finstar and U.S.Bank received copies of these checks identifying the #1845 Account as a customer segregated account once they were deposited or cashed by the payees.

379. PFG also wrote checks drawn on the house account that identified the account as PFG's house account, and Finstar and U.S. Bank received copies of the checks once they were deposited or cashed by the payees.

**Particular facts of U.S. Bank's relationship with Wasendorf and his Affiliates**.

380. U.S. Bank maintained several additional accounts for entities and individuals affiliated with Wasendorf and PFG, including personal accounts of Wasendorf and his family members and accounts for his other companies.

381. U.S. Bank also maintained accounts for Wasendorf & Associates, a publishing business; Wasendorfs restaurant, My Verona; and Wasendorf Air, the company created by

Wasendorf, Sn.

382.   U.S. Bank knew PFG was holding out the #1845 Account as its Segregated Customer Account.

383.   U.S. Bank knew that most or all of the funds in the #1845 Account were customer deposits that came from one of two sources: (I) deposits of checks at the Cedar Falls branch, or (ii) wire transfers from a PFG JPMorgan customer segregated account ending in #5265 into the 1845 Account.

384.   PFG deposited checks on a daily or near daily basis into the #1845 Account.  The amounts typically ranged from $500 to more than $25,000. The checks were drawn on accounts that belonged to many different individuals and entities across the country, and were clearly identifiable as customer funds directed to an FCM.

385.   PFG told its customers to make their checks payable to "Peregrine Financial Group, Inc.," or "PFGBEST Cust. Seg. Acct." A significant number of the checks PFG deposited in the #1845 Account were drawn to the "PFGBEST Cust. Seg. Acct." designation and many others had memo notations or other written statements stating they were customer funds.

386.   Upon information and belief, Millenium Trust on behalf of the Shefferts, Plaintiffs, and Behrens, made out the checks or wires that were sent to JPMORGAN for the "PFGBEST Cust. Seg. Acct."

387.   PFG stamped Plaintiffs' checks deposited into the #1845 Account with "PAY TO THE ORDER OF US BANK FOR DEPOSIT ONLY PEREGRINE FINANCIAL GROUP, INC., CUSTOMER SEGREGATED ACCOUNT 621011845," or words to that effect.

388.   When PFG deposited Plaintffs' checks into the #1845 Account, PFG also submitted U.S.Bank deposit slips that stated "Customer Segregated Account" or some variation thereof.

389.     PFG bundled the checks and deposited them in person at either the walk-up or drive-up counter at the Cedar Falls branch.

390.     US Bank knew That PFG was not treating the #1845 Account as a Customer segregated account,  rather like a personal and business account.

391.     PFGs deposits to the #1845 Account were customer funds subject to the segregated and/or secured account requirements, but PFG's frequent and substantial withdrawals were inconsistent with the types of transactions typical for a customer segregated account.

392.     During the above time period, PFG made hundreds of withdrawals from the #1845 Account, most ranging from tens of thousands of dollars up to several millions of dollars followed up with a similarly sized withdrawal shortly thereafter.

393.     PFG also made frequent electronic fund transfers and telephone transfers from the #1845 Account. JPMorgan's Unlawful Transfers of Plaintiffs Segregated Funds from the #5265 Account to the U.S. Bank #1845 Account.

394.     U.S. Bank received wire transfers from JPMorgan customer segregated accounts including #5265 into the #1845 Account.

395.     These transfers showed that the money being transferred into the #1845 account consisted of customer segregated funds including these Plaintiffs herein.

396.     U.S. Bank statements described the source of the transfers as"JPMCHASE*PFG CUST SEO ACCT" and "BANK ONE NA *CHI IL*PFGCUSTSEG."

397.     U.S. Bank nevertheless allowed Wasendorf Sn. unfettered access to the segregated customer accounts transferred by JPMorgan, despite the fact that the wires received from JPMorgan made it clear the customer proceeds were being transferred from a customer segregated account.

398.     PFG consistently withdrew substantial sums from the #1845 Account in

singletransactions during the relevant time period. U.S. Bank knows that FCMs rarely, if ever, made withdrawals and transfers of this type that were frequently made from their customer segregated accounts.

399.    Rather, the CFTC regulations only allow FCMs to deposit their own funds into their customer segregated accounts, since any excess funds will further protect customers in a volatile market. Thus, The FCM's excess funds are the only funds the FCM is permitted to withdraw for its own use. 17 C.F.R. § 1.23.

400.   U.S. Bank 'had no basis for believing that the transfers into and out of the #1845 Account involved PFG excess funds and there was no inquiry, documentation or other evidence to support the conclusion that withdrawals were legal.

401.    Rather, the obvious conclusion was that these withdrawals constituted unlawful conversions.

402.  Because these proceeds were held in special customer segregagated accounts, the bank defendants herein owed a special duty to Plaintiffs and a fiduciary duty to protect the assets held in this account and to discover and stop any transfers or use of the  proceeds other than for commodities fututres trading over a designated exchange.

403.   Since a number of sizeable transfers from the #1845 Account were made to Wasendorf Construction, to which U.S. Bank had recently extended a mortgage loan exceeding 66 million, in September, 2008 during the relevant time when Sub Class Members' A and B transferred funds to PFG through JPMORGAN and U.S. BANK, by allowing these transfers, U.S. Bank facilitated the prospects for repayment of its loan to Wasendorf Construction, thus directly benefiting from the transfers.

404.    Thus, a reasonable inference of intent and motive can be inferred from this distateful transfer from JPMorgan to U.S. Bank to Wasendorf Construction and then back to US

Bank to repay the $3,000,000.00 off in 2011.

405. The Federal Financial Institutions Examination Counsel (FFIEC) has identified "red flags" that should cause a bank or its employees to inquire further, and potentially file a suspicious activity report. PFG's #1845 Account triggered at least the following "red flags" during the relevant time period:

a. Inconsistent deposit and withdrawal activity;

b. Frequent deposits or withdrawals with no apparent business source;

c. Transactions that are not consistent with the customer's business;

d. Intrabank transfers between accounts owned or controlled by common individuals;

e. Large balances in non-interest bearing accounts;

f. Appearance of using account as a temporary repository for funds;

g. Deposits and immediate requests for wire transfers or cash shipments; and

h. Large deposits and balances.

406. The FFIEC also recommends that banks perform enhanced due diligence of certain accounts and customers that present a greater potential for violations of the BSA, including FCMs like PFG.

407. U.S. Bank allowed money to be transferred out of the #1845 Account and into Wasendorfs accounts despite these red flags.

**U.S. Bank  jeopardizing the safety of customer funds**

408. U.S.Bank did not act despite red flags and it did not get balance confirmation requests jeopardizing the safety of customer funds from members or the Exchange.

409. U.S. Bank knows that the CFTC and the NFA require FCMs to maintain a minimum amount of "adjusted net capital."

410. Adjusted net capital is a critical measure for FCMs. If an FCM's adjusted net

capital falls below proscribed limits, the FCM must "transfer all customer accounts and immediately ceasedoing business as a futures commission merchant" until it can reestablish the minimum threshold.  See 17 C.F.R. § l.17(a)(4).

411.    To track net capital, the CFTC and the NFA require FCMs to submit monthly unaudited financial statements and annual audited financial statements. See 17 C.F.R. § 1.10. FCMs file 1-FR forms on a monthly and yearly basis. The forms state the FCM's net capital requirement and actual net capital.

412.  U.S. Bank also knows that the NFA sends balance confirmation requests to banks that hold a material portion of an FCM's net capital to monitor the FCM's compliance.

413.   The NFA also sends balance confirmation requests if there are suspicious circumstances, suspected fraud, or past improper behavior by the FCM.

414.  FCMs' auditors also routinely send balance confirmation requests to banks as part of the certified auditing process. U.S. Bank is familiar with the auditing process performed according to AICPA or PCAOB standards, including the need for balance confirmations as part of that process.

415.   U.S. Bank personnel are trained and tasked to intake, evaluate, and respond to balance confirmation requests from the NFA and from FCMs' auditors.

416.  Because documents relating to U.S. Bank and PFG's accounts were diverted to the post office box Wasendorf set up, U.S. Bank did not routinely receive balance·confimation requests for PFG's accounts from the NFA or PFG's auditor.

417.   However, because U.S. Bank should have been expecting these requests for balance confirmations from the NFA, U.S. Bank should not be excused from failing to follow upto make sure the NFA had the correct addresses.

418.  U.S. Bank should know that it must fill out these essential documents on a timely

basis. Thus, when it did not receive such requests on a timely basis, U.S. BANK's compliance team should have called the NFA to receive these mandatory documents. Thus, a reasonable inference of Fraud by Omission and Conscious Avoidance of U.S. Bank is appropriate.

419. U.S. Bank has provided banking services to other FCMs in addition to PFG. It is familiar with the operating restrictions imposed on FCMs by the governing rules and regulations under the CEA and other relevant legislation.

420. In fact, upon information and belief, during the relevant time frame, US Bank acted as the depository Bank for at least 7 other Future Commission Merchants that held customer segregated accounts. Therefore, US Bank should have wondered why it never received any income verification notices from the NFA with respect to PFG when it was receiving other requests to fulfill its compliance requirements with respect to the other FCMs who were its customers.

421. Finally, in May 2011, however, U.S. Bank received a balance confirmation Request from the NFA for the #1845 Account.

422. This balance confirmation form was emailed by PFG's chief compliance officer to Hope Timmerman at U.S. Bank's Cedar Falls branch. The email said:

Dear Hope, Our Regulator the National Futures Association is currently conducting their annual audit of PFGBEST. Attached is the confirmation that needs to be completed. If you would be so kind to get these processed and emailed back to me and Lauren Boehm I would appreciate it. Lauren Boehm from the NFA will also be sending them via US Mail. NFA would appreciate an original hardcopy mailed back to them also. Thank you and have a nice week.

423. The balance confirmation form bore the falsified post office box address established by Wasendorf, rather than U.S. Bank's actual address, and identified the # 1845

Account as

"Peregrine Financial Group, Inc. Customer Segregated Account."

424.    U.S. Bank filled out the form in May, 2011, stating that the Segregated Account balance was $7,181,336.36, and did not change the address or the name of the account, and forwarded the form to both PFG and the NFA.

425.   Since the blank copy of the balance confirmation form that was mailed to U.S. Bank, and referenced in the email to Hope Timmerman, was sent to the post office box address established by Wasendorf, Sn., U.S. Bank never received it by regular mail but did receive it by email.

426.   When Wasendorf Sn. learned that the form had been emailed to U.S. Bank,  upon information and belief, Wasendorf, Sn. forged a new form that showed a balance of $220 million to be faxed to the NFA to replace the one U.S. Bank had completed.

427.   In the months that followed, U.S. Bank received no further Balance confirmation requests from   PFG, the NFA, or PFG's auditor.

428.  Upon information and belief, U.S. Bank did not follow up to  determine why it had not received the confirmation form or why no further forms were ever sent to it.

429.    More disturbingly, US Bank never notified the NFA of its correct mailing address, although it knew that the P.O. Box stated on the falsified  form FR-1 did not belong to US Bank.

430.   U.S. Bank should have followed up, realizing the wrong and invented address was on the balance confirmation form; and had US Bank been acting in good faith and fulfilling its fiduciary duty, it would have immediately made sure that the incorrect post office box was removed from the form, and called the NFA to discuss why the wrong address was on the form.

431.   Rather, upon information and belief, U.S. Bank conveniently left the incorrect P.O.Box address on the form that it returned to the NFA hoping to prolong this Fraud for enough

time to at least get the rest of the Construction Loan repaid by Wasendorf, Sn.

432. Thus, from May 11, 2011 to July 9, 2012, US Bank allowed this fraud to continue when the evidence was right before it and hiding in plain sight.

**U.S. Bank had Knowledge That PFG was Not Earning**
**Revenue From the #1845 Account and Was Not Profitable.**

433. U.S. Bank knows that FCMs ordinarily depend on revenue from customer segregated accounts through interest, earnings or repurchase agreements. While PFG executed at least one repurchase agreement with Finstar, in the years leading up to PFG's bankruptcy in 2012, PFG was not earning interest on the # 1845 Account and was not engaging in repurchase agreements with the #1845 Account funds.

434. U.S. Bank knew from PFG's 1-FR forms that PFG was maintaining a material portion of its reported net capital-typically well in excess of 10% of its total reported net capital-in the #1845 Account.

435. U.S. Bank also knew that PFG was not profitable from its inception through at least 2005 and that, during the few years that PFG accrued profits, those profits were only about $1-2 million annually.

436. Wasendorf Sn. represented to U.S. Bank that PFG was able to stay in operation despite many years of loses, because he was supporting PFG with money he had earned through his successful investments in Romanian real estate PFG's Record of Regulatory Violation.

**PFG's Record of Regulatory Violations**

437. PFG's history of regulatory violations was available from the NFA's publicly available data base of its members' disciplinary history. Some of these violations related to PFG's segregation of customer funds and reporting of net capital.

438. In June 2004, the NFA's Business Conduct Committee issued a disciplinary complaint alleging that PFG failed to audit Dominick Concilio, a conditionally registered sole proprietor introducing broker guaranteed by PFG. PFG agreed to pay a $5,000 fine and adopt new procedures to ensure compliance with the NFA's order.

439. In February 2012, the court-appointed receiver for a Ponzi scheme run by Trevor Cook sued PFG. The receiver alleged that PFG routinely ignored red flags about the operation of the Ponzi scheme and permitted the fraudster to open, manage and maintain trading accounts at PFG. Before his scheme was uncovered in 2009, over $190 million was stolen from investors, including about $30 million through accounts held at PFG. The discovery of the scheme was widely publicized. CNN, the Minnesota Star Tribune, and The New York Times all ran stories. PFG's involvement was a matter of public record and discussion as well.

440. In February 2012, the NFA's Business Conduct Committee ("BCC" hereinafter.) issued a disciplinary complaint against PFG, its president, Wasendorf Jr., and its chief compliance officer, Susan O'Meara that resulted in a fine of $700,000.00. The BCC alleged that PFG failed to supervise four of its guaranteed introducing brokers, or GIBs, who engaged in deceptive sales practices and made trade recommendations that maximized commissions without regard for the best interests of their customers. To settle the matter, PFG agreed to pay a $700,000 fine and refrain from any new guarantee agreements with introducing brokers for two years. PFG also agreed to hire an independent consultant to review its procedures for supervising s GIBs and retail customer accounts, and to designate an individual to act as its full-time anti-money laundering officer. The NFA publicly reported PFG's $700,000 fine and PFG included the fine on its financial statements, including statements it provided to U.S. Bank.

441. Upon information and belief, despite its knowledge of PFG's conduct and financial position and the numerous red flags known to it, U.S. Bank took no action to prevent

PFG's theft of customer money. U.S. Bank allowed PFG to deposit hundreds of checks into the #1845 Account, processed hundreds of transfers into and out of the #1845 Account, and never declined to authorize a withdrawal from the #1845 Account and never declined to accept the deposit of funds it knew to be customer deposits into the account.

442.  At the time PFG declared bankruptcy, U.S. Bank had over 30,000 page s of records related to accounts held by PFG, Wasendorf, Sn. and the other entities owned or controlled by Wasendorf., Sn.

**Intentional Conduct of JPMorgan Chase, NA
(JPMC) Leading to The Loss of Customer Funds**

443.  JPMorgan Chase N.A. ("JPMC" or "JP Morgan") operated under the same legal framework and had access to the same publicly available information concerning PFG as U.S. Bank

444.  From at least 2007 through the date of PFG's collapse in July, 2012, PFG deposited or instructed its customers, including Plaintiffs herein, to deposit customer funds into an account at JPMorgan ending in #5265 by wire transfer or by mailing a check to PFG's office. (During the same time period, however, checks from PFG customers that were sent to PFG's Iowa headquarters were typically deposited into the U.S. Bank account).

445.  Customer money sent to JPMorgan was deposited into one of four customer segregated accounts, including money sent to JPMorgan by plaintiffs herein.

446.  Upon information and belief, between June, 2008 and July, 2012, $94,000,000.00 was wire transferred in 12 separate traunches from JPMorgan's Customer Segregated Accounts into the U.S. Bank# 1845 Account.

447.  JPMorgan had an extensive banking relationship with PFG. JPMorgan held over 30 other accounts for PFG, including several foreign exchange accounts, accounts for precious

metals trading, and "house" accounts. JPMorgan knew that PFG was an FCM.

448. Because JPMorgan provided banking services to PFG and other FCMs, JPMorgan knew that FCMs are highly regulated by the CFTC and NFA, and that they are required to maintain customer funds for the exclusive benefit of their customers in segregated and secured accounts that are separate from the firm's funds. See 17 C.F.R. § l.20(a); see also 7 U.S.C. § 6d(a)(2).

449. JPMorgan was required to provide NFA regulators with confirmations of the balances of PFG's customer segregated accounts and to otherwise ensure that PFG's customer funds were properly segregated. In addition, JPMorgan (like U.S. Bank) is required to maintain procedures that allow it to know the true identity of each of its customers, ensure compliance with the BSA and other banking laws and regulations, and monitor accounts that show signs of suspicious activity.

450. JPMorgan expressly undertook to comply with the requirements of the CEA and CPTC regulations applicable to customer segregated fund accounts.

451. JPMorgan was required to provide PFG at the time the accounts were opened with written acknowledgment that the bank had been informed that the four accounts contained funds belonging to commodity or options customers and had to be treated in accordance with the CEA and CFTC regulations. See 17 C.F.R §§ 1.20, 1.49.

452. By its own acknowledgment, JPMorgan had a contractual obligation to hold customer money according to the CEA and CFTC regulations, and knew that the money could be lawfully used for the benefit of PFG's customers only.

453. JPMorgan breached its obligations to customers of PFG by transferring customer funds to the U.S. Bank #1845 Account.

454. JP Morgan failed to contact U.S. Bank to verify that the #1845 Account was in fact a

customer segregated account.

455.   Despite outward appearances, and its own practice of allowing PFG to treat the #1845 Account as a customer segregated funds account, U.S. Bank did not consider the #1845 Account to be a customer segregated account, upon information and belief.

456.   Instead U.S. Bank believed Wasendorf, Sn. was free to treat the money in the #1845 account as his personal property, and disclaimed any obligation associated with a customer segregated account.

457.   In fact, Hope Timmerman of U.S.Bank testified as follows concerning the #1845 account:

> Q: Peregrine Financial Group, Inc. and that's the account ending in 1845. Do you know the purpose of that account?
> A: No.
>
> Q: And the source of the funds that went into that account?
> A: No.
>
> Q: And that was a business checking account?
> A: Business commercial checking account.

See CFTC v. US Bank, NA., 13-cv-2041, Summary Judgment Order Doc. #112, p.11 (11/19/14 N.D. Iowa)

458.   Another U.S. Bank Employee, Douglas Boe, the Senior Vice President of Commercial Lending and Relationship Manager for the Peregrine/WasendorfRelationship in Cedar Rapids testified as follows:

> "Q: Are you familiar with customer segregated accounts?
>
> A: I have no idea what that means. Until--Until all this stuff went down.
>    I had no idea what that meant.
>
> Q: What's your present understanding of what a customer segregated account is?
>
> A: I trnly do not know what it means to have a segregated account. I did not believe I had one, so I'm not aware of the policies, procedures, and rules that would govern such an account.

Q: What about the definition? I mean what's your understanding as to--Do you have any understanding as to what customer segregated account means?

A: No

Q: Do you know if you've ever had a client that had a customer segregated account?
A: No."

See CFTC v. US Bank, NA., 13-cv-2041, Summary Judgment Order Doc.#112, pp. 7-8 (11/19/14 N.D. Iowa).

459.   Thus, JPMorgan without investigating the fact that US Bank was not treatingthe

#1845 account as a customer segregated account, unlawfully transferred customer money from

its segregated accounts including the JPMC #5265 accounts in an amount of no less than

$94,000,000.00 during the relevant time period into the US Bank #1845 account, where plaintiffs

and class members had deposited their funds.

460.   .JPMorgan aided and abetted Wasendorf Sn.'s conversion of funds where

Wassendorf, Sn. easily diverted millions in PFG customer funds for his own benefit.

461.   Thus, as a direct and proximate result of Wasendorf Sn.'s conspiracy with U.S.

Bank and JP Morgan, customer funds literally went missing and ended up in the coffers of

Wasendorf and many others.

 **Role of the CME and CME Group**

462.   Because PFG developed a close relationship with personnel at CME and CMEG

over their 20 year interaction, the CME and CMEG aided and abetted Wasendorf, Sn. by

creating the Omnibus Sub Account rules wrongfully allowing PFG to trade over the CME during

the relevant time frame or at least allowing PFG to hold itself out to the members of the public as

an FCM with the ability to clear trades, although many if not most trades in this Ponzi Scheme

were actually fictitious upon information and belief.

463.       In fact, during the relevant time period, Wasendorf Sn. personally forged close

connections with at least one executive at the CME namely one Jack Sanders a former Chairman of the Chicago Mercantile Exchange.

464. Upon information and belief, after Jack Sanders, left his chairman position at The CME, his Clearing firm helped Wasendorf, Sn. and PFG clear trades over the CME during the relevant time period.

465. Both Sanders and Wasendorf, Sn. served as Board Members of the NFA and had a working relationship.

466. In addition, during the relevant time period, Russell Wasendorf, Jr. worked at the CME prior to joining PFG.

467. Although the CME defendants had actual knowledge by 1996 that PFG was under capitalized and carrying under segregated accounts, based on public regulatory actions taken against PFG and the fines imposed on PFG by the CFTC and NFA for such misconduct: the CME defendants devised a unique method for PFG to continue in business and carry customer accounts as an FCM and settle customer trades.

468. The CME is a quasi-government regulator who has been given rule-making authority by Congress to help enforce the laws and rules of the United States enumerated in 7 U.S.C.§ 1, Et Al. Seq. and 17 C.F.R. §1, Et. Seq.

469. 7 U.S.C. §7 sets forth the obligations of the CME which have been designated as a Contract Market and Board of Trade to help regulate commodities trading activities.

470. However, The CME wears two hats, and it is also an agent of its Principal the CME Group, an unregisterd C Corporation. The CME and CME Group are alter egos of each other.

471. 7 U.S.C. §7(d)(lO) imposes the duty on the CME as a board of trade to provide rules and procedures to monitor trading and keep records:

"(10) Trade Information: The board of trade shall maintain rules and procedures to provide for the recording of safe storage of all identifying trade information in manner that enables the contract market to use the infom1ation:

      a.  to assist in the prevention of customer and market abuses; and

      b.  to provide evidence of any violations of the rules of the contract market

472.       7 U.S.C. §7(d)(1 l) also provides:

> "(11)Financial integrity of transactions
>   The board of trade shall establish and enforce—
>   (A) rules and procedures for ensuring the financial integrity of
>    transactions entered into on or through the facilities of the contract
>    market (including the clearance and settlement of the transactions
>    with a derivatives clearing organization); and
>   (B) rules to ensure—
>                (i)the financial integrity of any—
>                (ii)futures commission merchant; and
>                (iii)introducing broker; and
>                (iv)the protection of customer funds.

473.   Because CME and CMEG was never approved as a Boatd of Trade, it is not subject to immunity from suit based on these mandatory provisions.  As alleged, CMEG who runs the CME did not provide protection to plaintiffs pertaining to their customer funds, and therefore can be brought into court now based on their breach of contract claims and breach of fiduciary duty and other state law claims.

474.     Despite this clear mandate from Congress to the CME to establish rules to ensure the stability of these Designated Contract Markets/Boards of Trade in this case concerning the futures and options trading industry, the CME and CMEG intentionally and/or recklessly and/or negligently disregarded this mandate and instead set up rules, Omnibus Sub-Account rules, to allow PFG an undersegregated and undercapitalized  FCM and Wasendorf, Sn. to embark and continue on a path of unlawful conduct for a long period of time, while the CME and CMEG  were collecting fees in exchange under the guise of normal business

conduct.

475. Because CME and CMEG controlled all trading on its Exchange, it did not prohibit the use of naked puts and calls which lose 95% of the time.

476. The CME Clearing Financial Safeguards publication sets forth safeguards allowing the CME to monitor all trades on a daily and intraday basis to detect unlawful conduct such as disruptive trading practices that are defined in CME Rule 575 and/or spoofing, wash sales, fictitious sales, market manipulation or other unlawful conduct. The Financial Safeguard System Handbook states on page 13:

> "Intra-Day monitoring
> CME Clearing monitors intra-day price movement and trading activity throughout the trading session. To assess the impact of these price changes on clearing members intra-day mark to market calculations are performed on clearing members and customer positions and reviewed by CME clearing throughout the day and overnight."

477. In addition, the Financial Safeguard Handbook also sets forth the fact that pursuant to 7 U.S.C.§7, Et. Seq. the CME also engages in Financial Surveillance at page 12 of the Handbook it states in relevant part:

> "Recognizing the need to monitor the financial condition of clearing members, CME clearing's Audit Department in conjunction with other self- regulatory organizations operates sophisticated financial surveillance program. The program has several important aspects, as outlined below:,,, Reporting...lnspection...Information Sharing."

See CME Clearing Financial Safeguards, p.12.

478. The CME describes a Clearing Member as follows: "Clearing members are highly capitalized, closely monitored, and carefully selected companies that stand behind all trades made through the CME Group Exchanges. Clearing members assume full financial and performance responsibility for all transactions executed through them and cleared by CME clearing, whether it is for the account of a customer, a member or their own account."

-86-

see, www.cmegroup.com/company/membership/clearing.html.

479.    Although, PFG was trading over the CME Exchange as a non-clearing member upon information and belief, it had to be affiliated with a Clearing Member who was supposed to monitor PFG's trading activities.With respect to PFG's ability to trade over the Globex, again a Clearng Member had to supervise all PFG Globex Activity as well during the relevant time period.

480.    However, in this case CME Group without any Clearing House Member as a co-signatory entered into a Globex Co-Location Agreement directly with PFG, upon information and belief giving PFG the privilege to use the Globex, and there appears to be no requirement for any Clearing House Member to supervise such activities.

481.    However, despite these well-publicized safeguards, in this scheme, the CME disregarded its obligations and mandate as a Contract Market and Board of Trade under 7 U.S.C. § 7 to maintain a fair and stable Contract Markets.

482.    CME Group also failed to stop PFG's disruptive trade practices such as fictious trading as it is required to do under CME rule 575; and instead passed a set of other rules known as Omnibus rules which allowed PFG to skirt the regular rules including CME Rules 930 D.E.and  K and 575 and then to completely defraud investors over this 20 year period by trading under an Omnibus SubAccount.

483.    Therefore, as a matter of fact, the CME Group was not monitoring PFG's trading activities during the relevant time frame and allowed PFG to continue to trade in undermargined accounts in direct violation of CME 930 which was not applied to PFG under the Omnibus rules.

484.    In fact, although PFG held itself out as a Clearing firm in its IntroducingBroker Agreements and in public statements, in fact, PFG was not a Clearing member at all upon information and belief.

485. However, even with respect to non-clearing members such as PFG, CME as a designated Contract Market had rules in place to also monitor non-clearing members such as PFG during the relevant time period to ensure that anyone trading over the CME was not cheating and defrauding members of the public in any way.

486. For example, the CME and CME Group had in place a Business Conduct Committee that can take Emergency Actions to immediately shut down trading under a variety of circumstances present in this case, when Plaintiffs' life savings were being depleted and where PFG was at all times undersegrated, and therefore did not have the funds to even sustain margin requirements in the first place. Under these circumstances, had CME and CME Group been fulling its obligations to monitor the entire market, it would certainly have enforced its Emergency Rules to shut down PFG's conduct during the relevant time frame.

487. CME Rule 402.C, Sections 4, 5, and 7 were also violated in this case and these provisions certainly applied to Plaintiffs' case. The CME and CME Group through the Business Conduct Committee could have and should have taken Emergency action to stop the ongoing violations occurring in Plaintiffs' account and which applied to Clearing members, members and non- members alike.

488. CME Rule 402.C.5 applied to this case and states:

"The BCC is authorized to detennine whether an emergency exists and whether emergency action is warranted. The following events and/or conditions may constitute emergencies. Any circumstances in which it appears that a Member or any other person or entity has failed to perform contracts or is in such financial or operational condition or is conducting business in such a manner that such person or entity cannot be permitted to continue in business without jeopardizing the safety of customer funds, Members or the Exchange."

489. CME and CME Group personnel were also authorized to expel or stop members or non-members who committed offenses listed in CME Rule 432 including Section (B)(l) to engage

in fraud or bad faith conduct;(B)(2) to engage in conduct or proceedings inconsistent with just and equitable principals of trade; (C) to engage in dishonest conduct, and/or (D) to create or report a false or fictious trade.

490. Because CME and CMEG failed to expel PFG as a customer despite PFG's clear violations of 432(B)(1)(2)(C) and (D) by Wasendorf Sn., who used the CME to conduct its business and destroy customer accounts for over a 20 year period, CME did not comply with its mandates under 7 U .S.C. §7 and is liable to plaintiffs herein pursuant to 7 U.S.C.§25(b)(l)(A).

491. Because CME was acting as agent for CME group, an unregistered entity, CME group is vicariously liable for the acts of its agent, CME, not as a registered board of Trade, but as an agent for a private C Corporation.

492. Clearly, based on the facts that PFG was utterly undersegregated during the Relevant time period, it did not have margin requirements to sustain trades, therefore one of three unlawful acts was necessary to allow PFG to continue to trade either: (1) the trades were fictitious and were tracked and recorded in real time using the information from the Globex, (2) Agents and/or Employees at the CME allowed PFG to place trades without sufficient margin in place, (3) other entitties such as PFG's Clearing Member spotted cash to act as collateral or margin to place trades, having counterparties prearrange transactions. In each scenario, the conduct described is entirely violative of the CME rules requiring Emergency Action to stop the conduct that would have preserved Plaintiffs' life-saving.

493. Thus had the CME and/or CME Group been doing its proper market surveillence, PFG's nefarious conduct would have easily been discovered requiring immediate emergency action to shut Wasendorf, Sr. and PFG's trading activity down immediately, thus preserving Plaintiffs funds.

494. The Omnibus Rules allowing this misconduct showed negligence, tortious

intereference with Plaintiff's business and other legal violations of law proximately causing them to lose their life savings.

495.    Had CME and CME Group enforced its own Emergency Rules and other rules for Market Regulation as recited supra, Plaintiffs would not have lost their entire life savings, because PFG would not have been allowed to trade including improper positions involving naked puts and calls which CME should not have permitted to be initiated for members of the investing public.

**Undersegregation of PFG During the Relevant Time period.**

496.    Because clearing house members must maintain at least $5,000.000.00 in capital for clearing trades, it is obvious that PFG which was always undersegregated and undercapitalized did not have the financial integrity nor high capitalization to fulfill the CME requirements. See CME Rule 970.

497.    The fact that PFG publicly filed FR-ls in September, 2004, for example, that arescrutinized by the CME and CME Group stating that it had $111,173,782.00 in customer segregated funds and excess net capital of $7,872,278.00, should have raised a strong red flag to the CME and CME Group that there was Fraud occurring in violation of CME Rule 432(B)(l), because based on these numbers PFG certainly would have and should have applied for Clearing membership as of 2004.

498.    PFG's decision not to apply for Clearing Membership should have raised suspicion because by preferring to trade through another Clearing firm, required more payments of clearing fees, since the clearing firms charge fees for their clearing services.

499.   However, when PFG filed for bankruptcy in 2012 Schedule F was filed that shows all unsecured and non-priority claims such as Clearing fees. However, PFG's Schedule F does not appear to have any Clearing Firm listed who would be clearing trades for PFG as an

Omnibus Clearing Firm or Carrying Firm. Thus, it appears based on a review of Schedule F, there was in fact no Clearing firm actually trading and clearing options trades on behalf of PFG's customer       trading accounts. This fact perfectly coincides with the allegations herein that the trades had to be fictitious, and therefore were not even being cleared over any Exchanges by a CME Clearing firm at all.

500.   However, the sound rules described above where the CME (CME and CME Group Co11ectively) is acting as a regulator to provide a fair and stable contract market fe11 by the wayside when these Omnibus Trading Sub-Accounts were authorized and implemented by itself and  CME Group, its owner. These Omnibus Rules allowed PFG or other FCMS to clear trades through other Clearing House Members.

501.   Because the CME Group appears to control the Rulebook, this Omnibus Provisions that of the CME Group, not a Designated Contract Market and has never applied for registation for such status. However, CME Group owns and controls the CME and imposed that rule on CME during the relevant time period in violation of the CME self-regulatory mandate.

502.   These Omnibus Rules demonstrate the fraudulent nature of CME Group's representation to the public that they will ensure the integrity of the markets. Clearly, these Omnibus rules allowed for Wasendorf Sn.'s 20 year ponzi scheme.

503.  The way these opaque Omnibus rules are set up, the FCM such as PFG does not even have to establish initial margin requirements for each contract position established, but instead can just trade using the lesser amount of maintenance margin. Therefore, right off- the-bat, the FCM trading under an Omnibus subaccount is subject to a different set of rules and a preferential standard, requiring less not more financial integrity, and less financial soundness compared to other market participants who do have to post initial margin when entering into a long contract. Thus, this Omnibus Subaccount rule is entirely unfair, arbitrary and capricious and

preferential to firms like PFG who are undersegregated and undercapitalized and should not have even been allowed to trade at all.

504. In addition, the carrying FCM who actually clears the trades for the non- clearing FCM, does not have to monitor or scrutinize each customer's trade and only has to consider the gross amounts listed for each Omnibus subaccount. This "grossing up" rule which is not allowed for regular Clearing firms again allows the Clearing Omnibus firm and CME to completely ignore the trading conduct going on inside each customer's account as in the PFG customers' account where there were in fact these trading abuses occurring over a twenty year period. Non-Omnibus accounts are not entitled to this "grossing" effect and thus cannot skirt the regulations upon information and belief.

505. For example, if PFG was trading as an Omnibus subaccount with Clearing firm "X, " clearing firm X could consider the gross amount of monies in the PFG subaccount. If PFG had $1,000,000.00 in its house account and $700,000.00 was lost on behalf of these Plaintiffs, the Shefferts and the Behrens, then the Clearing FCM would only have to consider that there would be a gross amount of excess margin of $300,000.00 ($1,000,000.00-$700,000.00).

506. Under these insane Omnibus Subaccount rules, the Clearing FCM would not even have to report anything to anyone and would not have to look at any of the trades either to see as in this case, that the customers' accounts were being traded in an unlawful way; and after each customer was in a margin deficiency and under Rule 930 should have been required to have all trading cease.

507. According to the Omnibus Subaccount rules, Rule 930K, D, and E would not even apply, because these rules only apply to Clearing House members not non-members trading as FCMs or non-clearing members as part of the Omnibus Sub-Accounts.

508. The Omnibus rules were an intentional mechanism to allow PFG to trade and

generate enormous fees for a lot of entities including co-defendants herein and giving PFG the legitimacy it needed to accomplish this 20 year Ponzi scheme.

509.   In fact, the Omnibus Rules prohibit in some cases the Clearing member from even seeing what is going on in the customer's Omnibus Sub-Account and the rules state that under certain circumstances the Trader Administrator: "Cannot view trading sub accounts where the trading is not the trading sub account owner." See Omnibus Support Information.

510.   However, this arrangement was more to cover up what was really happening such as using fictitious trading to pull off this Ponzi Scheme, upon information and belief, so in effect, the Clearing firm was not clearing all the fictious trades upon information and belief which were recorded on another set of books just used for Wasendorf's Ponzi scheme.

511.   Another obvious red flag that would have exposed Wasendorf Sn.'s massive fraud immediately would have been to compare the actual amount of trading going on in a PFG subaccount with its stated Customer Segregated accounts to see this fraud. For example, if only $2,000,000.00 worth of trading was going on inside a subaccount, where PFG's stated segregated funds were $200,000,00.00, then this discrepancy would show that there was unlawful conduct occurring like fictitious trades on a separate set of books. This suspicion would be so because the customer segregated funds are for customer trades, and therefore the amount of trades should be nearly equivalent to the funds segregated for customer trading. A much lesser amount, would raise the obvious question of where is all the rest of the money going, and why is the volume so low.

512.   It appears that based on the set up of these Omnibus Rules, no records were kept or reviewed by the Clearing firm or CME to show these discrepencies and only the "gross" amounts were recorded. Clearly, PFG could put its own capital or money it stole including Plaintiffs'funds from the #1845 account into its own account to offset the trading violations ongoing in the

Omnibus Subaccounts.

513.  Thus, the imposition of the Omnibus Subaccount rules reduced the mandate given to  the CME under 7 U.S.C.§ 7d(l l) and enforced by CME group to "ensure the financial integrity of any-futures commission merchant, introducing broker and the protection of customer funds" to a nullity.

514.   The CME also acted in bad faith or constructive bad faith in purposefully creating these Omnibus Sub-Account Rules to accomodate Wasendorf, Sn. over a twenty year period, when Congress gave the CME rule-making authority to maintain a fair and equitable contract market.

515.  At any time prior to 2007, CME could have and should have expelled Peregrine as a customer of its Exchange due to continued violations of Peregrine with respect to violations of Margin Rules and other infractions such as maintaining under segregated customer accounts in its customer segregated accounts as far back as 1999.

516.  CME also acted in bad faith by failing to monitor the activities of Peregrine,a significant FCM in the Industry for nearly a decade and routinely turned a blind eye and gave Peregrine special status by allowing it to trade directly over the CME Globex through a co-location agreement even though it was a non-clearing member not a clearing member upon information and belief; and therefore perpetuated this Fraud on the Public for a long period of time and for over a decade.

517.  The CME group with full authority and on behalf of the CME entered into a Co-Location Agreement with PFG during the relevant time period and allowed PFG to easily defraud customers by purposefully giving PFG access to the Globex, the CME's electronic trading Platform.

518.  Although PFG was trading under an Omnibus Sub account, it appears that the

Co- Location Agreement is directly with the CME, and no Clearing Firm or Carrying members is mentioned in this Co-Location Agreement, although a Clearing Firm should have been named as the Carrying Firm but was not. See Co-Location Agreement.

519. Thus, it appears that through this Co-Location Agreement, Peregrine was given full privileges as if it were a Clearing Member, due to its Co-Location Agreement with CME Grnop which in exchange for a monthly fee of approximately $28,000.00, allowed PFG to directly link into the CME's Globex Electronic Trading Platform making it easy to trade and shadow trade freely to destroy customer accounts and clear trades electronically.

520. Furthermore, a review of this Co-location Agreement, demonstates that PFG as a customer was actually required to meet the same obligations as Clearing members, since it was given a Co-Location Agreement. Paragraph 13.13 states that all Exchange Rules shall apply to the Customer (PFG):

> "Exchange Rules. Customer hereby acknowledges and affirms that the Services provided hereunder are subject to the Exchange Rules. In the event of a conflict or inconsistency between the Exchange Rules and this Agreement, the Exchange Rules Shall govern."

521. Thus, under this Co-location Agreement, 13.13 CME Rule 930 applied to PF although it was not a Clearing House Member.

522. Therefore, PFG was also subject to the Rules of the Exchange applicable to Clearing members including Rules 930D, E and K which were breached and allowed this Fraud to go on for over 10 years right under the CME ls supervision.

523. Therefore, the CME Group in its desire to earn fees and maximize profits, allowed PFG, an under capitalized and under segregated FCM, to freely trade over the Globex during the Relevant Time Period and allowed this Fraud to continue unabated, since it appeared to the members of the public that PFG was properly engaging in trading activity when in fact it was using fictious trades and that never made it to the globex to wipe out customer accounts in

addition to naked puts and calls that CME should have prevented.

524. By failing to stop trading, CME, CME Group or its agent, the Cleaning firm who allowed PFG to maintain an Omnibus Account caused the Shefferts and Behrens accounts to go to almost zero by October 8, 2008. Had the CME or the clearing firm holding PFG's account enforced its plain rules under 930 to PFG, the darling of the industry, the loses to the Shefferts and Behrens would have been limited instead a total loss of their life saving.

525. Alternatively, PFG's trades on behalf of the Plaintiffs appear to be fictitious trades and never even happened, because there was insufficient margin to support any trading in PFG1s customer accounts. As such. the Clearing member who carried PFG1s accounts failed to monitor activity in the PFG Omnibus Account and spot evidence of fictitious trading activity as did the CME group as well who conduct market oversight over the CME.

526. The fact that the CME set up this Omnibus Account rules shows the bad faith and/or constructive bad faith and intent of the CME to aid and abet Wasendorf, Sn. by allowing the grossing of positions to exist in Omnibus accounts. Thus, in fact, the CME by weakening its mles and basically erasing Margin Requirement Rules, CME Rule 930, from all Omnibus accounts actually facilitated such criminals like Wasendorf, Sn. to freely engage in criminal conduct by wiping out customer accounts all-the- while letting this criminal conduct to hide and percolate in Omnibus accounts.

A.. CME also acted in bad faith or with constructive bad faith in failing to provide special rules for Plaintiffs' IRA retirement investments. CME should not have allowed these investors to trade these accounts over the Exchange ujsing naked puts and calls that lose 95% of the time.

**Defendants improper Use of IRA Accounts**

527. An IRA is a federally created Trust imposing duties on custodias such as IRA

Trustee and/or other custodians, to prevent this type of investment fraud.

528. Because CME allowed plaintiffs' IRA accounts to be used for trading purposes on its Exchange, they woefully failed to act in good faith in allowing Peregrine to invest Plaintiffs' IRA funds in high risk options contracts.

529. Individual Retirement Accounts came into existence in 1974, when they were created by the federal government in a statute known as the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, Title II, Sept. 2, 1974, codified at 29 U.S.C. § 1001 et seq. An IRA is a "trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust instruments contains the following requirements: ... (2) The trustee is a bank [as defined by statute] or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirement of this section. (3) No part of the trust funds will be invested in life insurance contracts. (4) The interest of an individual in the balance in his account is non forgettable. (5) The assets of the trust will not be commingled with other property except in a common trust or common investment fund..." Code § 408(a) (2008); see also, 26 C.F.R. Treas. Reg. §l.408-2(a-b).

530. The "written governing instrument creating the trust" in this case was Defendants' Millenium's standardized form contract that was entered into by Plainti upon information and belief. This non-negotiable IRA contract was presented on a take-it-or-leave-it basis to Plaintiffs and was not drafted, amended or negotiated in any way by Plaintiffs.

**Federally Created Minimum Fiduciary Standards Of Conduct For The IRAs**

531. Section 408 and the federal regulations promulgated thereunder, including 26 C.F.R. § 1.408-2, use the language and terminology of trust law (such as "participant," "beneficiary," "fiduciary" and "trustee") in specifying the trust and the

relationship that any form contract or "written governing instrument creating the trust" was required to use under federal law, it was obligated to comply with the following minimum standards and owed the following duties to preserve the Trustres of each Plaintiff.

532. The CME therefore should be held to a fiduciary duty regarding any funds used to trade over the CME exchange to help regulate the market place to make it safe for members of the investing public like Plaintiffs herein. See Treas. Reg. 1.408-2(e)(viii)(6)(i)(A).

533. The fiduciary duty to keep custody of investments, and except for investments pooled in a common investment fund in accordance with the provisions of the Treasury Regulations, to refrain from commingling the investments of each account with any other property. Treas. Reg. 1.408-2(e)(v)(A).

534. The fiduciary duty to deposit assets of accounts requiring safekeeping in an adequate vault. Treas. Reg. 1.408-2(e)(v)(B).

a. The fiduciary duty to determine the assets held by it in trust and the value of such assets at least once in each calendar year and no more than 18 months after the preceding valuation. Treas. Reg. l.408-2(e)(5)(ii)(E).
b. The fiduciary duty to receive, issue receipts for, and safely keep securities. Treas. Reg. 1.408-2(e)(4)(ii).

535. This case should impose a custodial obligation on CME whenever IRA money is being used to make trades over its Exchange.

536. Because no agent bothered to contact Plaintffs during the week of October 2, 2008 to inform them of their Margin Call, CME's rules were flouted and Plaintiffs' account allowed to dissipate absent receiving margin call notification.

537. CME should be charged with their own duty to contact its market participants under these circumstances.

538. Indeed, during the week of October 2, 2008 through October 8, 2008, CME did nothing to protect Plaintiffs' investments, and should have stopped the trading under

these circumstances.

539.  Had CME and CMEG immediately acted to stop trading upon a margin call, they would have preserved most of the assets in the plaintiffs IRA accounts.

**Red Flags That Were Ignored By CME**

540.  Had Defendants CME had appropriate rules in place to monitor those who are allowed to trade over its Exchange, it would have learned that the Maxwells were not registered to trade futures options contracts and that Garlon Maxwell had a discharge in Bankruptcy and was not an appropriate person to handle money, as well as federal tax liens, as well as a fine and cease and desist order from the Iowa Department of lnsurance.

541.  CME also would have found out that Amber Maxwell was also unregistered and also had a fine and cease and desist order against her as well.

542.   Such untoward activities were a red flag that shows that CME could have stopped Plaintiffs from being the victims of this Ponzi scheme had they had appropriate rules in place.

543.   Instead, defendant, CME, allowed PFG, the Maxwells and Comeau as their general purpose agents to seek out and advise Plaintiffs to transfer IRA and pension fund monies to PFG for trading over th CME Exchange allowing CME and Peregrine to earn fees and other mcome.

544.  If  CME had performed even a modicum of due diligence in investigating the qualifications and background of the brokers allowed to trade over its Exchange like the Maxwells, Steven Brewer and Comeau, they would have found such a sufficiently large "red flag" in their lack of professional accomplishment and standing that no prudent fiduciaiy or custodian, acting in the best interests of the public, would ever have allowed PFG and the Maxwells and Perry Comeau to continue as they did.  Had CME been performing its duties in a legally sufficient and proper manner, they would have become aware of the "red flag" that PFG

and the Maxwells were failing to provide prudent investments in PFG's customers' retirement accounts.

**Foreseeability**

545.  In addition to being extremely foreseeable, such dissipations of customer accounts have actually occurred repeatedly where breaches of duties to hold and not commingle occur. These and many other incidents made it even more foreseeable to Defendants that their failure to follow standard industry procedures exposing Plaintiffs to substantial losses. But Defendants still did not change their wrongful conduct of failing to hold, failing to question about, failing to follow the rules, and failing to monitor and preserve the assets entrusted to them.

546.  As a direct result of defendants CME's conduct, Plaintiffs were caused to lose their entire IRA and life savings

**Continuation of the Ponzi Scheme**

547.  Russell Wasendorf, Sn. had actually already stolen the entire customer sub-accounts in Step one of his Ponzi Scheme. He was then able to pocket customer monies initially because his Co-Conspirators, defendants U.S. BANK, NA and JPMORGAN CHASE, N.A., literally allowed him full-access to customer segregated accounts for his own personal use. He therefore easily could and did pocket customer segregated funds for himself and his co-conspirators, Introducing Brokers and CTAs, Exchanges and Depository Banks, and an IRA trust Company with whom he eventually shared the proceeds of the customers' stolen monies by way of distributing" transaction fees."

a.      Thus, these Customer Segregated accounts which are afforded a high degree of protection in Depository Banks were unlawfully depleted and used for the benefit of the Defendants instead of the customers.  The evidence is clear that these customer monies were routinely turned over to Mr. Wasendorf Sn. who in turn eventually distributed these converted customer monies to the

other Defendants and co-conspirators over a twenty year period..

**Causation and Damages: Plaintiffs Were Unable To Recover in their NFA Aribratoins from 2009 to 2011 and The NFA was the DSRO for PFG.**

548.    a.  As a direct result of this RICO Ponzi Scheme Plaintiffs lost their life savingswhere margin calls were issued without any notification to them leading within one week to a total destruction of their accounts.  The Ponzi Scheme continued where PFG, and  others including Millennium Trust, Brewer Futures Group, Inc., Steven Brewer, Russel Wasendorf, Sn. Russel Wasendorf, Jr., and Perry Comeau acted in concert as Futures professionals, Associated Persons, Future Commission Merchants and/or Introducing Brokers in 2008 when plaintiffs' customer accounts were transferred to Peregrine. Such conduct was in violation of 7 U.S.C.§ 2l(b)(3)(A)(B)(C) and (D) as well as 7 U.S.C. § 2l(b)(4), as well NFA Compliance Rule 2-4, and NFA By-law 301 and NFA Compliance Rule 2-24 and NFA Registration Rule 401.

b.   The Scheme was able to continue where registration status pursuant to NFA Rule 2-24  and Registration Rule 401 to Perry Comeau or his company Black Inc. Trading was pending  when he was subject to a Cease and Desist Order issued by the Iowa Department of Insurance and was not proficient in Options and testified under oath that he simply did not understand the investments made by the Maxwells on behalf of Plaintiffs.

c. The NFA by allowing these persons to conduct business without compensating Plaintiffs for these loses failed to provide a fair and equitable arbitration process for  members of the Investing Public in violation of NFA Code of Arbitration and 7 U.S.C. § 2l(b)(l0).

549.    As a direct and proximate cause of these bad faith violations, Plaintiffs were caused to lose their life savings because the NFA allowed this unlawful conduct to continue. The NFA's conduct also proximately caused  Plaintiffs to be deprived of a full and fair recovery in their NFA arbitrations which would have made them whole but for the violations of the NFA..

550. For example, in 2012 shortly after Claimants or Plaintiffs herein were caused to lose their NFA arbitrations, the Business Conduct Committee of the NFA levied a $700,000.00 fine against PFG and Russel Wasendorf, Jr., Susan O'Meara and Nolan Schiff for nearly identical conduct to which these Plaintiffs complained herein where crooked other brokers using PFG as their FCM defrauded customers into entering naked puts and calls, which are bound to lose and did lose.

551. Conspicuously absent from the NFA, BCC Complaint was any claim against Russel Wasendorf, Sn. who was the mastermind of the this operation. Certainly, NFA did not want to shine a light on Wasendorf, Sn, although he had ultimate responsibility for PFG.

552. At the time the NFA just said that these trades were deceptive practices and didnot attribute this strategy to Wasendorf Sn. and his permanent plan to destroy customer accounts after pocketing each one's monies contained in each's customer segregated accounts.

553. It is unfathomable that PFG would prevail on these plaintiffs arbitrations when PFG was clearly vicariously liable for the conduct of their agents under the Commodity Exchange Acts' strong vicarious liability statute in 7 U.S.C. §2(a)(l)(B), and that the NFA itself would profit handsomely from identical conduct and keep $700,000.00 of stolen customer monies as a fine against PFG. This $700,000.00 fine appears to have unjustly enriched the NFA and these funds should have been returned to investors such as Plaintiffs herein who had legitimate claims.

554. That the NFA Business Conduct Committee held PFG responsible for the same conduct that befell Plaintiffs herein shows that the Arbitration process failed.

555. Based on the temporal proximity of the fine imposed by NFA of $700,000.00 and the loss of the Plaintiffs' arbitrations which all occurred within a short time of each other, it can be reasonably inferred that the NFA was aware of the egregious misconduct that befell Plaintiffs and profited by $700,000.00 from these deceptive practices that somehow the Plaintiffs'

Arbitrators could not figure out.

556.  NFA's Business Conduct Committee never did anything with respect to investigating Plaintiffs' complaints. Thus, the subsequent $700,000.00 fine related to other similarly situated customers as Plaintiffs herein who suffered in a similar manner to the Claimants' herein.

557.  NFA was also the DSRO or Designated Self-Regulatory Organization that was supposed to assist the CME and CFTC with supervision and regulating PFG.

558.  As part of NFA's duties as PFG's DSRO, NFA was the one to audit its customer segregated accounts pursuant to NFA Bylaw 1001 entitled Financial Requirements Sections 1 through 4(a)-(e) which mandates that both the FCM and the Depositories in this case U.S. Bank and  JPMorgan Chase Bank, N.A. report balances of customer segregated accounts on a monthly basis. Section 4(C) of NFA By-law 1001 states for example:

> " In addition to the requirement of CFTC Regulation 1.49.(d), in order to be an acceptable depository to hold customer segregated funds account identified in CFTC Regulation 1.20, the depository must report the balances in the FCM's customer segregated funds account(s) held at the depository to NFA or a third party designated NFA in the form and manner prescribed by NFA."

559.   NFA By-Law 1001, 4(c) clearly mandates that the depository, such as U.S. Bank and not the FCM such as PFG report their customer balances.

560.    Charged with this mandate, the NFA on a monthly basis sent account verification forms to various Depositories including U.S. Bank on a monthly basis to ascertain the amounts of customer segregated accounts in the 1845 account and others.

561.     These balances were crucial because these balances helped to calculate and determine whether each FCM had adequate funds in place to sustain margin requirements. After all the CME Group requires a level of liquidity for trading contracts or margin, and the CME Group depends upon FCMs and/or Clearing Members to guarantee margin requirements. If an

FCM does not have sufficient funds to sustain margin requirements, it is supposed to be shut down by the NFA, CFTC or CME.

562. In this case, upon information and belief, Wasendorf, Sn. used photoshop to make up his own account verification forms that were supposed to be filled out by U.S. Bank, one of his Depositories and the holder of the 1845 Customer Segregated Accounts.

563. Wasendorf, Sn. created a U.S. Bank, P.O. Box and gave it to the NFA so that the NFA would send monthly verification request forms to U.S. Bank at this "P.O.Box."

564. NFA accepted this information from PFG as to where to send the monthly request form 1, even though NFA was auditing PFG.

565. Alternatively, NFA never asked U.S. Bank where to send the monthly request forms although U.S. Bank was the Depository obligated to fill out and return the monthy account verification forms.

566. These monthly numbers were critical to determining whether PFG was undercapitalized where it did not have enough funds in relation to it customer's funds to satisfy NFA requirements which would have caused it to close its doors as an FCM.

567. Wasendorf, Sn. would receive these forms at the P.O.Box and then forge the account verification forms and send them back to the NFA with the falsified customer segregated account amounts. By 2012, he stated that there was approximately $200,000,000.00 (Two Hundred Million Dollars) in the 1845 accounts when there was approximately $5,000,000.00 (Five Million Dollars) in this account in 2012.

568. These amounts were also reported to the CFTC probably by the NFA who posted them on the CFTC website on a monthly basis for all to see.

569. This pattern took place for many, many years, approximately 20 years.

570. First, US Bank during the relevant time frame held customer segregated accounts

for at least 7 other Future Commission Merchants ("FCM") who were also subject to the same exact regulations by the NFA and required the same exact compliance by having U.S. Bank mail in monthly account verification forms to the NFA.

571. U.S. Bank received these other 7 FCMs monthly account verification forms at their correct address from the NFA except for PFG whose request went to a solitary P.O.Box.

572. U.S. Bank never called the NFA during this time period to inform NFA that U.S. Bank never received account verification forms to fill out on behalf of their 1845 account.

573. NFA, despite sending out at least 7 other monthly request forms to the correct address at U.S. Bank never bothered to contact U.S. Bank by telephone to inquire as to why PFG had a separate P.O. Box, unlike the other 7 FCM's.

574. Nobody at NFA thought it was unusual that NFA would send out all the other requests for account verification to the same address at U.S. Bank except for Wasendorfs account verification request that went to a solitaiy P.O. Box.

575. Clearly over a 20 year period the NFA had constructive knowledge that this P.0.Box was incorrect and not the same as the other 7 FCM's who used U.S. Bank as its depository.

576. NFA never questioned why U.S. Bank's monthly responses for its other 7 FCM account verification statements contained a different return address on the U.S. Bank envelope and was not the same one as PFG return address which used a P.O. Box.

577. NFA's conscious avoidance of these obvious red flags demonstrates that NFA did not want to do anything to disrupt the apple cart especially when Wasendorf, Sn. was sitting on the Advisory Board of the NFA, and was considered a respected member of the NFA.

578. Secondly, U.S. Bank knew that it was their obligation to send back monthly account verification statements to NFA pursuant to NFA By-law 1001, Section 4(C). U.S. Bank could

not "delegate" this task back to Mr. Wasendorf because under the clear NFA By-law, 1001 4(C), it was U.S. Bank's duty to make this report and send it back to NFA.

579.  Because NFA was conducting an audit of PFG, the audit required U.S. Bank not PFG to send back account verification forms to state customer segregated account balances.

580.  U.S. Bank for approximately 20 years, never informed NFA that no monthly verification forms were ever received by U.S. Bank.

581.  U.S. Bank knew that it was not receiving monthly account verification forms for PFG for 20 years.

582.  U.S. Bank consciously avoided knowledge that it was not fulfilling its obligations under NFA By-Law 1001-4(C).

583.  When U.S. Bank looked at the CFTC website each month and saw that there was reported customer segregated amounts for PFG, US Bank knew that no part of these numbers was coming from U.S. Bank.

584.  U.S. Bank had constructive knowledge that the customer segregated amounts reported each month to the CFTC for PFG were incorrect.

585.  U.S. Bank had actual knowledge that the reported customer segregated amounts reported each month to the CFTC for PFG were inconect.

586.  U.S. Bank knew that it was its sole duty to make these disclosures pursuant to NFA By-law 1001, 4(C) and this duty could not be delegated back to Wasendorf.

587.  Thus, U.S. Bank knew during this 20 year period that someone was filling out the account verification fonn on its behalf, and that someone was Mr. Wasendorf.

588.  Because these monthly statements were reported on the CFTC website each month, U.S. Bank allowed Wasendorf, Sn. to continue this fraud, and clearly aided and abetted such

inexcusable and unlawful conduct.

589. There came a time in 2011 when Hope Timmerman of U.S. Bank emailed or faxed back to NFA the FR-1, income verification form, after receiving a request by email from NFA.

590. Russel Wasendorf, Sn. received a copy of this document and went into high gear. He re-sent NFA a corrected form with apologies signing Hope Timmerman's name to it. He re-wrote the account statement from the correct amount of approximately $7,000,000.00, to the fraudulent amount of approximately $200,000,000.00

591. Despite these two disparate amounts reported, NFA accepted the corrected amounts without further investigation..

592. NFA never followed up with U.S. Bank to verify the accuracy of the second corrected verification.

593. Because NFA failed to gather the correct account verification information for a 20 year period, it failed to fulfill its obligations to gather proper account information, despite all of the red flags and failed to expel Wasendorf under NFA Rule 2-4 for such fraudulent conduct and permitted PFG to remain an FCM despite its under segregation for approximately 20 years.

**Subsequent Relevant Facts**

594. Plaintiffs received a letter dated July 31, 2012 from Mr. Thomas attempting to reopen Plaintiffs' case after their NFA arbitrations failed.

595. Mr. Thomas explained that because U.S. Bank was part of another Class Action, Plaintiffs Shefferts and Beherns could participate to gain recovery of their investments.

596. Plaintiffs took steps to protect their claims by filing notices of claim in Bankruptcy based in part on Paul Thomas's July 31, 2012 letter.

597. The letter dated July 31, 2012, was another effort by Mr. Thomas to take hold of Plaintiffs cases to again make sure these Claimants would be defeated so as to protect the

co-conspirators herein.

598.   However, when the case with U.S. Bank settled, in or about 2015 or 2016, Plaintiffs were not included in this Class Action Settlement. Thus, again Mr. Thomas' promises were empty and intentionally designed to throw plaintiffs off-base.

## EQUITABLE TOLLING OF THE STATUTES OF LIMITATION

599.   Based on the totality of the circumstances that befell these plaintiffs where their moneys were pocketed by Wasendorf, their accounts were destroyed by the Maxwells and Perry Comeau, their attorney committed legal malpractice and cooperated with PFG to ensure that the clients lost; and the NFA's role in protecting the Status Quo where in fact not one claimant who ever appeared before the NFA with a claim in excess of $100,000.00 ever prevailed in an NFA arbitration against Wasendorf or PFG during the 17 years that NFA reported such statistics, these defendants under equity are estopped form asserting any Statute of Limitations Defense.

600.   Although Plaintiffs' trading accounts were terminated at Peregrine in October, 2008, and they were told by Garlon Maxwell that they had been financially wiped out around that time, the nature of their loses due to the pocketing of segregated customer monies was impossible to determine until much later beginning in July, 2012 when Russell Wasendorf, Sn. stated in a suicide note that he had been pocketing customer moneys in segregated accounts.

601.   However, that suicide note was part of the on-going fraudulent concealment of the Total Ponzi Scheme described herein involving these Defendants.

602.   The fraudulent concealment continued by the CME Group establishing a $100 million dollar fund to repay only certain PFG customers to throw off the members of the public to the fa03t that they had allowed this Ponzi Scheme to flourish for at least 20 years since it was an essential part of the Scheme to trade over the CME or use Shadow and Fictitious Trades using the Globex which would have allowed real time quotes to exactly match the phony

and ficititious trades that had to have gone on upon information and belief.

603.   Peny Comeau in Iowa fraudulently concealed his role in this Scheme by pretending to help his neighbors by introducing them to Paul Thomas, where the two were determined to protect the RICO Scheme and defeat claimants case.

604.   The July 31, 2012 letter of Paul Thomas, Esq. also was fraudulently concealed by solely blaming U.S. Bank, N. A. to cover up his role in this Scheme and the role of the other defendants herein.

605.   However, the Shefferts and  Behrens and others took steps to diligently prosecute and preserve their rights under the law during the relevant time period, notwithstanding their lack of full understanding of what transpired. They took reasonable and continuous steps to protect themselves and recover their investments.

606.   These diligent efforts demonstrate that Plaintiffs are entitled to Equitable Tolling based on Fraudulent Concealment of this case.

607.   With respect to Defendants CME, a self- regulatory agency, these facts concerning discovery of these claim are self-concealing.

608.   Because the discovery of the real facts that occurred leading to the theft of customer monies was still under scrutiny through at least 2016 and thereafter, it would require extraordinary efforts to have unmasked the facts. Thus, Plaintiffs' claims are timely because the law requires only that Plaintiffs use reasonable efforts, as they did.

609.  Thus, Equitable Tolling based on fraudulent concealment is appropriate under the totality of the circumstances.

610.   Plaintiffs have limited resources and limited education; therefore they should be afforded Equitable Tolling based on Fraudulent Concealment, since it was through no fault of their own that this fraud continued for over a twenty year period, undiscovered by anyone else.

611. Based on the relation back doctrine, all of Plaintiffs' claims are timely.

612. Plaitniff's Arbitration in 2009 did not and could not have included the subsequent revelation of the facts of this matter describing a 20 year Ponzi Scheme until Mr. Wasendorf revealed it in his suicide not. At that time in 2012, when it was first undiscovered that Wasendorf was stealing customer monies. As such, no *res judicata,* or any other type of preclusion is appropriate based on the new set of facts that were concealed untl 2012.

613. Plaintiffs, the Shefferts and Behrens decided not to proceed with Mr. Thomas at that time because of costs associated with hiring him as their attorney, but they wanted to recover for their loses and realized that the fraud was much larger and different from the claims known at the time of their NFA arbitrations.

614. After making reasonable inquiries as to how to proceed, Plaintiffs decided to protect their interests by simply filing Notices of Claims in the pending Bankruptcy Case which was handling customer claims against U.S. Bank and JPMorgan, N.A. that was pending as a result of the Peregrine Bankruptcy.

615. Plaintffs filed their notices of claims timely by the end of 2012, and did not hesitate to do so in a timely manner. They proceeded in an orderly fashion to get in line for an orderly distribution.

616. Based on the Letter they received from their prior attorney, Paul Thomas, Esq. dated July 31, 2012, they were under the distinct impression that they would be entitled to a distribution from at least U.S.Bank, N.A. based on the new evidence of liability due to Wasendorf 's stealing of customer monies.

617. Plaintiffs could not reasonably have discovered the facts of defendants' violations until after the law enforcement and regulatory investigations began on July 9, 2012. Until then, Plaintiffs and Class members did not understand the nature of the total conduct giving

rise to the Class Action claims previously alleged and alleged herein, and believed they were doing everything to protect their rights.

618. During this time, CME Group had also established a $100 Million dollar fund to compensate only certain PFG customers and this 100 Million Fund did not include Plaitiffs herein, but did compensate Farmers 100% for their PFG related loses with very few questions asked.

619. In addition, during the same time frame, a Class Action was also commenced in 2012, In Re Peregrine Financial Group Customer Litigation, 1:12-cv-05546 (the "first" class action) which at first appears to cover the present Plaintiffs herein and alleged in that Complaint all customers of Peregrine; however, such Plaintiffs were later decertified in or about 2016.

620. Therefore, by the end of 2012, after filing their proofs of claim timely and having heard about the First Class Action, Plaintiffs could do nothing more to protect their rights in 2013 believing that the filing of the bankruptcy proofs of claims was the proper procedure, and awaited a Class Settlement so that they could finally be made whole.

621. However, Plaintiffs Sherri and David Sheffert were required to take more action in 2014 and 2015 when Mr. Ira Bodenstein, the PeregrineTrustee objected to their Notice of Claim.

622. Despite the approximately 4000 page Schedule F, Mr. Bodenstein singled out the Shefferts and moved to expunge the Shefferts claim before the Honorable Bankruptcy Judge Carol Doyle. The Shefferts vigorously opposed this motion. The Shefferts took reasonable steps to continue to protect their rights and Mrs. Sheffert appeared telephonically before the Bankruptcy Court with counsel in Chicago to plead their case, at their expense.

623. After an oral argument was presented, Mr. Bodenstein, decided to move to withdraw his objection to the Sheffert's Claim; and by Order of the Court dated March 19, 2015, Judge Doyle allowed the claim as a Schedule F general, unsecured claim. Therefore, it appears

despite a Court order, Mr. Bodenstein perhaps was able to expunge the Sheffert's claim after all hoping nobody would even notice.

624. During this time, Mr. Bodenstein, the Peregrine Trustee, upon information and belief had assumed the role of Plaintiff in the Class action, and would be recovering proceeds from US Bank and JPMorgan on behalf of the Bankruptcy Estate including claim holders, the Shefferts and Behrens.

625. However, when the First Class Action settled on or about June, 2015, the Plaintiffs herein were not included in the First Class Action notwithstanding their Order entered by Judge Doyle on March 19, 2015.

626. When Sherri Sheffert realized that she was not receiving a Notice of claim form to fill out and she never received any notices from the First Class Action except the original objection to her claim, she decided to consult with counsel. She was concerned about protecting her rights and did not want to get pushed under the carpet again.

627. Despite confusion, it appeared to her that by 2015 to 2016 after the claim forms were distributed and due, she was not being included in the First Class Action after all. She again consulted with an attorney sometime after that to see where she stood and to see what further steps she had to take to protect her rights.

628. It was at this point when Counsel realized that she would not be participating as a Class member in the First Class action and that action needed to be taken. Thus, counsel reviewed the boxes of materials and consulted with an expert and had to review the entire case from scratch to see where the case stood in good faith and after numerous proceedings had occurred.

629. Thus, after counsel evaluated the case, it was filed as soon as the claims were understood and after plaintiffs learned for sure that they were not part of the Class Action

Settlement, and after Plaitnffs had exhausted their administrative remedies.

630. Allison Hudson Esq. an attorney working with Mr. Bodenstein confirmed that Plaintiffs would not be recovering under the Class Action, late in 2015 or in 2016, upon information and belief.

631. Because Plaintiffs could not have reasonably discovered the facts constituting Defendants' violations until sometime after July 9, 2012, and because they did not know that they would be excluded from the Class until approximately 2016, their claims accrued in 2016 and any applicable statutes of limitations should be equitably tolled.

632. Because Plaintiffs were named originally as Class Plaintiffs in the First Class Action, but were decertified so to speak when the Plan of Allocation was filed on June 18, 2015 (Docket Entry 410-7) In re Peregrine Financial Group Customer Litigation, 12-cv- 5546, the Class of Plaintiffs also changed and only included those PFG customers who had current account balances as of 2012, The Plaintiffs herein are also entitled to Equitable Tolling Under American Pipe.

## STATE LAW CLAIMS FOR RELIEF

### CLAIM I- Principal Agency Liability

633. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

634. To the extent that each defendant had employees and/or agents working in furtherance of this fraudulent, reckless and or negligent conduct, each defendant is vicariously for the acts of its employees and agents or another person acting on each one's behalf under Iowa common law.

### CLAIM II- Fraud by Omission Against Defendant U.S. Bank and JP Morgan, and CME Group.

635.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

636.    U.S. Bank and JPMorgan Chase, NA ('JPMC" hereinafter)(collectively referred to as the "Bank Defendants' hereinafter") failed.to disclose to Plaintiffs all of the facts known to the Bank Defendants as set forth above, including that (I) PFG was holding the 1845 Account out to be a customer segregated account., (ii) the 1845 Account was not actuallytreated by US Bank as a customer segregated account, (iii) PFG was using the

1845 account as a customer segregated account to draw customer funds into the 1845 Account, and  (iv)  PFG was misappropriating the customer funds in the 1845 Account by failing to segregate them and by spending them or allowing them to be spent for the benefit of PFG, its affiliates, Wasendorf, Sn. and other non-PFG customers.

637.   The Bank Defendants.had a legal duty to disclose its knowledge because ithad superior knowledge of the above facts and far more experience dealing with FCMs, segregation requirements, and related requirements than PFG's customers. In addition, Plaintiffs had trust and had confidence in banks like U.S. Bank and JPMC that banks would disclose such knowledge. Further, The Bank Defendants are in a position of influence and superiority over the Plaintiffs.

638.   Plaintiffs and had a fiduciary obligation to Plaintiffs to protect their customer segregated accounts.

639.   The Bank Defendants' knowledge, had it been disclosed, would have been material to Plaintiffs. The facts known to the Bank Defendants, stated above and throughout the Complaint, substantially affected the interests of the Plaintiffs, and the non-disclosure of that knowledge induced Plaintiffs to act, including by mailing or wiring their money to PFG and/or JPMC or continuing to entrust their money to PFG. Plaintiffs would not have mailed or wired

their money to PFG or continued to entrust their money to PFG had the Bank Defendants disclosed its knowledge to them that their money was not being used for customer trading and being sent to non-segregated house accounts of PFG and Wasendorf personally.

640. The. Bank Defendants knew that Plaintiffs did not share its knowledge of the facts stated above and throughout the Complaint and knew that Plaintiffs would not have expected those facts to be true.

641. Alternatively, the Bank Defendants acted with reckless disregard for the truth and or consciously avoided to learn the details of the PFG Conversion of Customer Funds, although these Bank defendants had a birds eye view of the financial picture of PFG and should have easily discovered the Fraud in 2007 and 2008 instead of consciously avoiding it, as they did.

642. The Bank defendants acted with intent to deceive and an intent to induce action by Plaintiffs because, among other things, the necessary and foreseeable consequences of The Bank Defendants' failure to disclose its knowledge was that Plaintiffs would mail or wire their money to PFG, JPMC or US Bank or continue to entrust their money to PFG for the settlement of Futures and Options Transactions.

643. Plaintiffs acted in justifiable reliance on The Bank Defendants' failure to disclose its knowledge when they mailed or wired PFG their money or when they continued to entrust their money to PFG. Plaintiffs and other members of the proposed class acted in a manner consistent with how a reasonably prudent person in their position would have acted, particularly given (I) their lack of access to the facts U.S. Bank and JPMC knew, (ii) U.S. Bank's and JPMC's fiduciary status, (iii) U.S. Bank's and JPMC's concealment of the information, (iv) their inability to detect the fraud, and (v) the nature of the omitted information. Had The Bank Defendants

disclosed its knowledge to Plaintiffs, they would not have mailed or wired their money to PFG or

would not have continued to entrust money.                                                        .

644.    As a direct result, the Plaintiffs were injured and suffered actual damages and

punitive damages.

**CLAIM  III-Violation of the Illinois Fiduciary Obligations Act, 760 Ill. Comp. Stat. § 65.1
et seq., or, alternatively, of various states' enactments of the Uniform Fiduciaries Act.
(As Against The Bank Defendants and CME Group)**

645.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set

forth herein.

646.   PFG owed a fiduciary duty to its customers, including Plaintiffs and the other

members of the proposed class including Plaintiffs IRA accounts.

647.   The Bank Defendants knew that PFG was an FCM in possession of

customer funds and that PFG owed a fiduciary duty to its customers.

648. . PFG deposited checks that were made payable to itself as a fiduciary into the 1845

Account. PFG also deposited checks and other funds that it possessed as a fiduciary into the

1845 Account.

649.    PFG breached its fiduciary duty to Plaintiffs. U.S. Bank allowed PFG to deposit

checks into the 1845 Account and accepted wire transfers from the JPMorgan customer

segregated account into the 1845 Account.

650.   U.S. Bank further allowed PFG to withdraw funds from the 1845 Account for use

other than for the Customers to whom the funds belonged; U.S. Bank and JPMC had actual

knowledge of PFG's breach of fiduciary duty and misappropriating its customers' funds.

651.   The Bank defendants had express fact information that the funds were being used

for non-customer purposes in violation of the fiduciary relationship.

-116-

652.   Alternatively, the Bank Defendants acted in bad faith because it knew of obvious circumstances indicating that PFG was breaching its fiduciary duty to Plaintiffs and other members of the proposed class but deliberately refrained from investigating PFG's activities so as to avoid knowledge that PFG was breaching its fiduciary duty. In doing so, the Bank Defendants acted in a commercially unjustifiable manner because, among other things, it disregarded and refused to learn facts readily available to it that indicated PFG was breaching its fiduciary duty and misappropriating customer funds. It was bad faith for the Bank Defendants to remain passive.

653.   The actual and foreseeable result of the Bank Defendants' conduct was the loss of the funds belonging to Plaintiffs who have suffered and will continue to suffer damages as a result.

.**CLAIM IV- Breach of Fiduciary Duty Againt All Defendants**

654.   Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

655.   The Bank Defendants were on actual or inquiry notice that a diversion of fiduciary funds including IRA funds by Wasendorf, Sn. and PFG would occur or was ongoing-.


656.   The Bank defendants knowingly breached its fiduciary duties to PFG's commodity customers by among other things:

(a)  Accepting for deposit funds that were designated for a customer segregated account by Plaintiffs and proposed class members and depositing them instead into PFG's non- customer segregated account (the 1845 Account) or transferring them from JPMC's customer segregated account 5265 into the 1845 account;

(b) Failing to identify, monitor, or exercise due diligence related to discrepancies and

inconsistencies concerning PFG's deposits of Plaintiffs' funds;

(C) Failing to implement and adhere to compliance and monitoring protocols concerning

PFG's use of Plaintiffs' funds;

(d) Failing to identify, monitor, or exercise due diligence related to the regulatory and compliance "red flags" identified herein;

(e) Failing to identify, monitor, or exercise due diligence related to PFG not treating the 1845 Account as a customer segregated account;

(f) Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for the operational expenses of PFG;

(g) Failing to prevent PFG and Wasendorf from using funds designated for customer segregated accounts for PFG, its affiliates, Wasendorf, and other non-PFG customers

(h) Failing to notify Plaintiffs, other members of the proposed class, PFG management, PFG's auditor, or any governmental entity or regulator about PFG and Wasend01fs misappropriation of funds designated for customer segregated accounts; and

(i) causing and allowing customer assets to be misappropriated for the use of PFG, its affiliates, Wasendorf, and other non-PFG customers.

657. As a dircct and proximate consequence of the conduct of the Bank Defendants, as described in this Complaint, Plaintiffs have lost a their money, securities, and property they paid and delivered to PFG to margin, guarantee, or secure their commodity or options trading or to support securities transactions.

658. Plaintiffs have been denied the use of their customer funds and property since no later than July 9, 2011, and have been damaged thereby at an amount to be determined at trial.

**CLAIM V- Breach of Contract Including Its Obligation of good faith and Fair Dealing against CME Defendants and the Bank Defendants.**

659.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

660.    Defendant CME Group acted on behalf of its subsidiary CME who was statutorily required to have in place provisions and capacities for the "prevention of market manipulation" (7 U.S.C.§§ 7(b)(2), "fair and equitable trading" (7 U.S.C. §§ 7(b)(3)), "financial integrity of transactions" (7 U.S.C.§§ 7(b)(5), "compliance with (its) rules" (7 U.S.C. §§ 7(d)(2)), and the "monitoring of trading" "to prevent manipulation, price distortion and disruptions of the delivery or cash-settlement prices." (7 U.S.C. §§ 7(d)(4).

661  . Because the trading of PFG customer accounts were based in part on manipulation of the FOREX markets by JPMC as well as fictitious trading, violation of Margin Rules under 930, D. E. and Kand/or trading without sufficient margin in place, the CME rules were violated in this Scheme.

662.    Defendant CME on behalf of its principal CME Group was also required pursuant to §2l(b)(7), to have rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, in general, to protect the public interest." As alleged with particularity herein, the Exchange Defendants failed to protect the public interest and to preserve fair and/or unmanipulated and fraud-free markets for the trading of futures contracts.

663.  CME Group working with its subsidiary CME ran the Exchange and held iself out to Plaitniffs members of the public that CME group would maintain a safe contract market

664.  Plaintiffs were intended third party beneficiaries of any contracts made by PFG on their behalf with CME and CME group.

665. Plaitniffs were direct parties to the contracts traded over the Exchange and entered into by PFG on the Plaintiffs' behalf.

666. At all times, CME and CME group had an obligation of good faith and fair dealing to enforce all contracts in an equitable manner for the benefit of Plaintiffs. Herein, CME Group and its agent CME breach their contractual obligations to Plaintiffs herein thereby causing them a total loss of their customer accounts as well as Punitve damages. CME's conduct as alleged herein violated its obligation to pass and enforce rules and regulations relating to market and financial integrity and stability. The CME

667. Defendant's continuous refusal and unwillingness during the relevant period to properly audit and/or examine PFG's account including its account balances including its adjusted net capital and segregated accounts nor to monitor the trading in the PFG Omnibus Sub accounts in accordance with CFTC and CEA mandates, caused harm to Plaintiffs by allowing Wasendorf Sn. to commit fraud in connection with these unmonitored subaccounts and/or to use real time information found on the Globex to accomplish "virtual" trading accounts for each PFG customer so that PFG could easily and in real time destroy customer accounts and/or to conduct off-the-book transactions.

668. By setting up rules to insulate PFG from scrutiny as in the case of these Omnibus Sub account rules which actually shielded the activity in the PFG accounts from any kind of surveillance, PFG's customers were subject to abusive trading practices including fictitious sales.

669. Had the CME defendant, knowing about PFG's past violations, carefully monitored and scrutinized the trades going on in these Omnibus Sub-accounts, instead of consciously avoiding the truth of the matter, there would have been ample evidence of misconduct, because only through a pattern of misconduct could PFG have accomplished the Scope of this Fraud over a twenty year period. However, had the CME had proper rules in place to monitor all customer

accounts, not just some accounts, in their two-tiered approach to regulation, it would have been evident that there was no money in each omnibus sub account to even conduct trades or post initial margin.

670.   Plaintiffs were third-party beneficiaries to the Co-Location Agreement entered into between PFG and CME Group during the relevant time period.

671.  According to this Agreement, PFG was subject to the Exchange Rules including Rule 930 by virtue on entering into the Co-Location Agreement with CME Group.

672.  As such, CME Group was obligated to enforce Rule 930 against PFG during the relevant time period, which would have caused CME Group to shut down PFG's trading of Plaintiffs' accounts which were under margined and required CME Group to stop any more trading in Plaintiffs' accounts.

673.  Plaintiffs were intended beneficiaries to this Co-Location Agreement based on the numerous literature published by CME Group and CME stating their intentions to protect the integrity of the CME Exchanges. Because members o the public invested in this Exchange, clearly these investors were intended beneficiaries of this Co-Location Agreement.

674.  Because Plaintiffs accounts were being ostensibly traded over the CME Exchange, they were in privity with the CME.

675.   Because PFG engaged in fictitious trades using the Globex to shadow trade accounts, the CME Group failed to stop the conduct and caused plaintiffs to lose their life savings.

**CLAIM VI-Against CME Group for negligence and gross negligence**

676.   Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein

677.   CME Group had a duty to the members of the public who traded over the CME

Exchange to reasonably maintain the Exchanges for the members of the investing public so that the members of the public could receive fair and equitable trading practices in connection with each one's account.

678. CME group acted unreasonably and recklessly with respect to the allowing PFG to continue to trade over the CME Exchange for a twenty year period where PFG was grossly undercapitalized, did not comply with margin requirements or rules; engaged in fictitious trading, and did not have sufficient capital to conduct trading activities during the relevant time frame.

679. As such, PFG used fictitious trades to destroy plaintiffs accounts using the Globex to track real time trades in their Ponzi Scheme whereby Wasendorf Sn. first pocketed plaintiffs accounts and then used the CME to make sure the Plaintiffs accounts were destroyed.

680. Due to CME Group's negligent and/or grossly negligent conduct, and immediately expelling Wasendorf Sn as a CME customer, plaintiffs accounts were allowed to destroyed by Wasendorf over the CME Exchange thus proximately causing Plaintiffs' losses.


**CLAIM VII- <u>Breach of Fiduciary Duty and Unwritten Contract Against the Cme Group</u>**

681. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

682. CME Group as the owner of the CME Exchange owes a fiduciary duty to the members of the public who invest over the CME Group's Exchange by virtue of the fact that CME is a designated contract market whose stated purpose is to ensure integrity of the Market place for the public investments. As a designated contract market, CME must pass rules and enforce the laws and rules of the United States to protect investors from bad faith conduct that

occurs over the CME Exchange.

683. Because CME Group is not a designated contract market, CME Group owes a high degree of care and a Fiduciary duty to all customers including plaintiffs who traded fuhrres and options contracts over the CME during the relevant time frame.

684. CME Group breached its fiduciary duty as well as it sunwritten contracts with Plaintiffs by allowing Wasendorf and PFG to engage in phony trade, fictitious trades, undermargined trades, prearranged sales and other conduct over a 20 year period that caused plaintiffs herein to lose their entire investments through Exchange activity.

685. The CME group using its market surveillance could have monitored PFG's account and realized these accounts were grossly under margined and immediately shut down trading in PFG's account under its Emergency powers and other powers.

686. The CME Group, Inc. breached its fiduciary duty and unwritten contracts to Plaitniffs: By allowing PFG and Wasendorf, Sn. to set up an Omnibus Sub Account despite the fact that they were at all times during the relevant time period undercapitalized and under segregated and had no business trading over the Exchange.

687. By allowing the rules relating to Omnibus accounts to exist, the CME defendants could see no evil and hear no evil by their own rule-making authority and freely allowed this criminal conduct to occur over the CME without any supervision or surveillance by the CME, which allowed Omnibus accounts to use a gross amount to evaluate the trading in each non-clearing customer's account.

688. The CME group breached its fiduciary duty and unwritten contracts to plaitniffs-inter alia, by failing to provide a safe and stable contract market for Plaitniffs investments; by giving Wasendorf and PFG a co-location agreement allowing PFG to use the Globex so that PFG

could freely use this electronic platform to close out customer accounts and/to conduct shadow trading in customer accounts which actually never even made it onto the Globex system but were just shadow trading using the Globex technology for price quotations and settlement prices.

## CLAIM VIII- Aiding and Abetting Against All Defendants

689.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

690.     All defendants aided and abetted PFG in allowing this PonziScheme to exist for a twenty year period causing Plaintiffs' total loss of their life saving.

## CLAIM IX-Violation of IOWA Code 706.A2, Et.Seq. against defendants.

691.  Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

692.     Based on the Foregoing, Defendants violated Iowa Code 706.A2, Et. Seq.

## CLAIM X- Negligent and Intentional Infliction of Emotional Distress Against All Defendants.

693.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

694.  Plaintiffs experience emotional distress due to defendants' conduct.

## CLAIM XI.  Punitive Damages (As Against All Defendants)

695.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

696.     By reason of the foregoing willful and unconscionable conduct causing severe monetary losses and emotional distress, and as a matter of public policy to punish defendants for such conduct, plaintiffs seek punitive damages for their losses. Punitive damages are sought in excess of jurisdictional limits of this Honorable Court to be determined at trial.

-124-

697.  PFG using the CME Exchange to deplete customer funds while CME Group never stopped  PFG or expelled  PFG from the CME Exchange for it numerous violations which would have prevented plaintiffs losses.

**CLAIM XII   Unjust Enrichment and Restitution under State Law (As against All Defendants**

698.   Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

699.      Based on the foregoing, Defendants were unduly and unjustly enriched and will be asked to disgorge the fees gained from the above facts and to establish a fund ro compensave victims in addition to the $100 million dollar fund already set up by CME to compensate farmers and rancers.

**CLAIM XIII- Intentional Interference With Contract and prospective business advantage (Against All Defendants)**

700.  Plaintiff incorporate by referenced all of the foregoing allegations as if fully set forth herein.

701.  Plaintiffs entered into a contract with  PFG such that PFG would trade futures and options contracts for Plaintiffs over the CME Exchange.  This contract was enrtered into in 2007.

702.   Defendants all knew about this agreement between Plaitniffs and  PFG.

703.   Defendnats by their conduct and failure to act intetnionally and improperly interfered with the proper performance of plaintiffs contracts with PFG.

704.   The intereference by defendants made it impossible for these contracts to be properly performed.

705.    As a result, Plaintiffs sustained a total loss of their investments linked to performance of said contract with PFG.

-125-

## DEMAND FOR JURY TRIAL

725.   Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the

Federal Rules of Civil Procedure, of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment:

(A)     Awarding damages, including pre-judgment interest, on each claim in an amount to be

established at trial

(B)     Awarding punitive and treble damages in an amount to be established at trial,

(C)     Impressing a constructive Trust on the ill-gotten gains of Defendants in the ultimate res

of which each proposed class member shall have an undivided interest;

(D)     for reasonable attorneys' fees and costs of investigation and litigation; and

(E)     granting such other relief as to this Court may deem just and proper.

February 13, 2025

Respectfully Submitted, Susan J. Levy, Esq.

By: /s/ Susan J. Levy, Esq
  Susan J. Levy.
  Attorneys for Plaintiffs
  *Pro Haec Vice*
  40 East 10th Street Suite 2K
  New York, New York 10003
  Tel: (212) 962-1782
  Fax: (212) 962-3711
  Email: sjl9265@gmail.com

  Paula Roby, Esq.
  Day Reitig Martin, P.C.
  150 First  Avenue, N.E. Suite
  P.O.Box 2877
  Cedar Rapid, IA 52406-2877
  Phone: (319) 365-0437
  Fax:    (313) 365-5866
  Emails: Paula@drpjlaw.com

-126-